1   CYNTHIA L. MELLEMA (State Bar No. 122798)
    JEFFRY BUTLER (State Bar No. 180936)
2   MEGAN L. DUNHAM (State Bar No. 245991)
    SONNENSCHEIN NATH & ROSENTHAL LLP
3   2121 N California Blvd., Suite 800
    Walnut Creek, CA  94596
4   Telephone: (925) 949-2600
    Facsimile:  (925) 949-2610
5   Email:     cmellema@sonnenschein.com
               jbutler@sonnenschein.com
6              mdunham@sonnenschein.com

7   Attorneys for Defendant
    ALLSTATE INSURANCE COMPANY
8

9              UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11             SAN FRANCISCO DIVISION

12  DORIS J. GILTON,                          No.

13          Plaintiff,                        NOTICE OF REMOVAL OF A CIVIL
                                              ACTION
14      vs.

15  ALLSTATE INSURANCE COMPANY,
    and DOES 1 through 50, inclusive,
16
            Defendants.
17

18

19      TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

20  NORTHERN DISTRICT OF CALIFORNIA AND TO PLAINTIFF AND HER ATTORNEYS

21  OF RECORD:

22      PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. section 1441(a), defendant hereby

23  removes to this Court the action described herein and respectfully submits the following

24  statement of grounds for removal:

25                      THE SUPERIOR COURT ACTION

26      1.    On April 10, 2008, an action was commenced in the Superior Court of the State of

27  California for the County of San Francisco, entitled "*Doris J. Gilton  v.  Allstate Insurance*

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA  94596-7342
(925) 949-2600

1    *Company, and Does 1 through 50, inclusive*," Case No. CGC 08 474148 (the "Superior Court

2    Action").

3        2.    In the Superior Court Action, plaintiff seek damages on account of Allstate's

4    alleged breach of contract and breach of the covenant of good faith and fair dealing. In the

5    Complaint, plaintiff claims Allstate has failed to fulfill its contractual obligations under the

6    policy. Further, plaintiff asserts a cause of action for breach of the implied covenant of good

7    faith and fair dealing based on Allstate's handling of plaintiff's insurance claim. Plaintiff seeks

8    general and punitive damages, attorneys' fees and costs of suit.

9                                    SERVICE

10       3.    Plaintiff served the Summons and Complaint in the Superior Court Action on

11   Allstate on or about April 24, 2008. Attached as Exhibit A to this notice are true and correct

12   copies of the Summons, Complaint, Superior Court documents served with the Complaint and

13   Allstate's Answer (which Allstate filed in the Superior Court on May 22, 2008). Allstate

14   believes these documents constitute all pleadings and documents on file in the Superior Court

15   Action.

16                            DIVERSITY OF CITIZENSHIP

17       4.    Plaintiff Doris Gilton was, at the time of filing of the Superior Court Action, now

18   is, and at all relevant times has been, a citizen and resident of the State of California.

19   (Complaint, ¶ 4.)

20       5.    Defendant Allstate was, at the time of filing of the Superior Court Action, now is,

21   and at all relevant times has been, a corporation organized and existing under the laws of the

22   State of Illinois, with its principal places of business in the city of Northbrook, Illinois.[1]

23       6.    Plaintiff and Allstate, accordingly, are citizens and residents of different states.

24

25

26

27   [1] Plaintiff's Complaint alleges that Allstate is a citizen and residence of San Francisco,
     California. (Complaint, ¶ 6.) As a mater of public record, that is not true. Further, having filed
     many cases against Allstate previously, plaintiff's attorney is well aware that Allstate is
28   considered a citizen and residence of Northbrook, Illinois. (See Exhibit B, Allstate Insurance
     Company's Request for Judicial Notice, ¶ 1, 2, 3, Ex. 1, 2.)

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N. CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

1

<u>AMOUNT IN CONTROVERSY</u>

7.   The amount in controversy in the Superior Court Action, exclusive of interest and costs, exceeds the $75,000 jurisdictional minimum.  In plaintiff's complaint, she seeks damages in excess of $25,000.  (Complaint, ¶ 16, 23.)  In addition, plaintiff's prayer for relief seeks a judgment of $1,000,000 in the event of a default judgment.  (Complaint, prayer for relief, ¶ 4.)

8.   At a minimum, plaintiff is currently seeking seven months of Additional Living Expenses totaling $129,150.  ( See Exhibit C, Declaration of Richard Reney [Reney Decl.], ¶ 2, Ex. 1.)   In addition, plaintiff demands $42,000 in engineering fees and $7,346 in permit fess.  (Reney Decl., ¶ 3 , Ex. 1.)  Accordingly, plaintiff seeks losses related to the claim over $75,000.

9.   Additionally, plaintiff seeks to recover attorney's fees.  (Complaint, prayer for relief, ¶ 8.)  Attorneys' fees incurred to compel payment of insurance policy benefits unreasonably withheld are recoverable as an element of damages under *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), and therefore must be included in calculating the amount of controversy.  *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155-56 (9th Cir. 1998).

10.   Plaintiff also seeks an undisclosed amount of punitive damages.  (Complaint, ¶ 35.)  In calculating the amount in controversy, the Court must consider the punitive damages that may be recovered by plaintiff if her claim for punitive damages should prevail.  *Surber v. Reliance Nat. Indem. Co.*, 110 F. Supp. 2d 1227, 1232 (N.D. Cal. 2000).

<u>ORIGINAL JURISDICTION</u>

11.   The Superior Court Action is a civil action of which this Court has original jurisdiction under 28 U.S.C. section 1332, in that plaintiff and Allstate are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.   The case is therefore one which Allstate may remove to this Court pursuant to 28 U.S.C. sections 1441 and 1446.  The removal is effected less than thirty days after service of the Complaint in the Superior Court Action, in accordance with 28 U.S.C. section 1446(b).

WHEREFORE, Allstate hereby gives notice that this action has been removed, in its entirety, from the Superior Court of the State of California for the County of San Francisco to

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N. CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

1     the United States District Court for the Northern District of California, San Francisco Division

2     for further proceedings as though it originally had been instituted herein.

3                              Respectfully submitted,

4     Dated: May 22, 2008                SONNENSCHEIN NATH & ROSENTHAL LLP

5

6

7                                By _____

                                    CYNTHIA L. MELLEMA

8                                Attorneys for Defendant

9                                ALLSTATE INSURANCE COMPANY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N. CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

# EXHIBIT A

4/24/08 → 2:45P

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Allstate Insurance Company and Does 1 through 50. Inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Doris J. Gilton

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

BY FAX

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court, County of San Francisco<br>400 McAllister Street<br>San Francisco. CA 94102 | CASE NUMBER 08-474148<br>*(Número del Caso):* |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Marcus Daniel Merchasin, SBN 55927
582 Market Street. Suite 1400. San Francisco. CA. 94118  415-678-2700

DATE. **APR 1 0 2008**      Gordon Park-Li      Clerk, by _____ **ELIAS BUTI** , Deputy
*(Fecha)*            *(Secretario)*            *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

(SEAL)

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Allstate Insurance Company

under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
      ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
      ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
      ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465



Marcus Daniel Merchasin, SBN 55927
Attorney and Counselor at Law
582 Market Street, Suite 1400
San Francisco, California 94104

Telephone Number: 1-415-677-9700 CASE MANAGEMENT CONFERENCE SET

Attorney for Plaintiff

SEP 1 2 2008 -9:00 AM

DEPARTMENT 212

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| DORIS J. GILTON, | CASE NUMBER:  C G C -08 -474148 |
| *Plaintiff,* | COMPLAINT FOR DAMAGES: |
| | 1. BREACH OF CONTRACT |
| v. | 2. TORTIOUS BREACH OF COVENANT – |
| | COVENANTS OF GOOD FAITH AND FAIR |
| ALLSTATE INSURANCE COMPANY AND DOES | DEALING (VIOLATION OF COMMON LAW |
| 1 THROUGH 50, INCLUSIVE, | DUTY) |
| *Defendants.* | |
| | DEMAND FOR JURY TRIAL |

*Plaintiff alleges as separate and distinct causes of action:*

#### For A First & Distinct Cause of Action – Breach of Contract
#### (As Against All Defendants)

1. The true names and capacities of Defendants Does 1 through 50, inclusive, are unknown to Plaintiff. Plaintiff is informed and believes that Does 1 through 50 inclusive are citizens of the State of California and are authorized to do business in the State of California and participated in, inter alia, the acts, conduct and omissions complained of herein. Plaintiff thereby sues said Defendants by such fictitious names. Plaintiff is presently unaware of all of the facts upon giving rise to a cause of action against the Defendants, actually or fictitiously named in this pleading. Plaintiff reserves the right to amend this Complaint to properly include their true names, status and capacities and all relevant and otherwise appropriate facts when the same are properly and adequately ascertained pursuant to *Code Civ. Proc. § 474 et seq.*

2. Each of the Defendants is responsible for the circumstances, predicaments, detriment, liability, occurrences, acts and omissions alleged herein and that Plaintiff's damages were proximately caused by the Defendants' conduct, acts and omissions and on going conduct, acts and omissions.

3. At all relevant times, Defendants were the brokers, underwriters, claims personnel, adjusters, examiners, agents, servants, supervisory and/or managerial personnel with appropriate authority, and/or employees of each other, acting within the course and scope of their agency, service and employment, with the encouragement, knowledge, acquiescence, consent, direction, approval, control and/or ratification of each other and were aiding and abetting each other.

4. Plaintiff resides in San Francisco, California. As used herein, the term Plaintiff may be interchangeable with the term "*insured*," "*insureds*" or "*Gilton*" as the context may so indicate.

5. Plaintiff at all times herein mentioned was doing business with Defendants in San Francisco wherein this contract were made, entered and to be performed with Defendants in San Francisco, California which is in this Judicial District whereupon Defendants obligations with Plaintiff arose.

6. Defendant Allstate Insurance Company is a corporation doing business in San Francisco, California, and has its principle place of business and/or offices in San Francisco, California, and in doing the things herein alleged did in fact do them or omitted to do them when otherwise required to perform such duties and or acts here in San Francisco, California. Defendant Allstate Insurance Company is a California citizen and resident of San Francisco, California.

7. Defendant Allstate Insurance Company may hereinafter be referred to as "*insurer*" "*insurance company*", "*Allstate*" and/or any other similar or appropriate term.

8. Defendants are insurers authorized to issue and deliver policies of liability insurance in the State of California and admitted by the California Insurance Commissioner to transact and were transacting insurance business in the State of California as defined by *Ins. Code § 24* and on that basis, inter alia, Plaintiff entered into said Contract with Defendants.

9. Defendant insurer, by virtue of the laws of the State of California, issues property and casualty insurance to businesses and individuals in the State of California, investigates and adjusting claims in the State of California, defends its insureds in California courts and hires California resi-

1  dents to provide various service in connection with the investigation, adjustment, settlement or de-

2  fense of claims arising in the State of California.

3      10. Plaintiff is informed and believes and thereupon alleges that Defendants participated in, inter

4  alia, the advertisement of the insurance in question, the setting of policy limits, the writing of poli-

5  cies, issuing insurance, collecting premiums, billing the insured, underwriting the insurance in ques-

6  tion, the handling and/or adjusting Plaintiff's claim, communicating with Plaintiff and/or Plaintiff's

7  agents and/or public adjusters and/or attorneys, responding to demands and/or improperly ignoring

8  them as the case may be, corresponding with Plaintiff, taking statements and investigating the loss,

9  and in otherwise delaying and/or denying the claim.

10      11. Within the four years last past, Plaintiff entered into a written contract of insurance with De-

11  fendants for claim number 0101901023 and/or such other policy or policies as proven at the time of

12  trial to indemnify and defend Plaintiff from a contingent loss in accordance with the laws of the

13  State of California which will hereinafter be singularly and collectively referred to as the "*contract*."

14  Plaintiff's copy of the written insurance policy were destroyed in the fire suffered by Plaintiff on

15  April 17, 2007. Plaintiff has requested a replacement copy of said insurance policy from Defen-

16  dants, but Defendants have failed and/or refused to provide the same, thereby making it impossible

17  for Plaintiff to attach a copy of the same hereto. Said contract was annually renewed and was in full

18  force and effect on the date of loss.

19      12. Plaintiff is informed and believes and thereupon alleges that Defendants' policy of insurance

20  to Plaintiff was delivered to Plaintiff in the State of California. Throughout the period of said con-

21  tract and at all relevant times herein alleged, all premiums were regularly and timely paid in the

22  State of California and each act required on the part of the insured to keep the contract in full force

23  and effect were performed.

24      13. Plaintiff has performed all terms, covenants and conditions required of Plaintiff except for

25  those, if any exist, which were waived, excused or made impossible to perform by Defendants.

26      14. On or about April 17, 2007 in San Francisco, California, Defendants became indebted to

27  Plaintiff by reason of an event which was insured against, causing damages to Plaintiff for which

28

1  Defendants had entered into an insurance contract with Plaintiff to indemnify Plaintiff against such
2  loss, damage or liability arising from a contingent or unknown event as defined by *Ins. Code § 22.*

3     15. The losses sustained by Plaintiff by reason of the casualty were covered under the terms of
4  the insurance policy that is the subject of this litigation. Under the terms of the contract and in ac-
5  cordance with the laws of the State of California, the Defendants became obligated to defend Plain-
6  tiff from such claims and/or losses and/or additionally to indemnify and/or hold Plaintiff harmless
7  therefrom.

8     16. Plaintiff timely presented the claim and has sought to respond and reply to all inquiries, dis-
9  cussions, reporting requirements, documentation requested, and negotiations engaged in by Defen-
10 dants to resolve the claim. Defendants, in spite of the above, have not paid the claim. Plaintiff has
11 sustained special damages in excess of $25,000.00 the jurisdictional minimum of this court.

12    17. Plaintiff has repeatedly made demand for prompt payment, defense and/or indemnification
13 from Defendants and has diligently pursued the claim seeking protection under said policy of insur-
14 ance.

15    18. Defendants have not investigated the claims made and/or paid the undisputed amounts.
16 Plaintiff has negotiated in good faith with Defendants, who delayed in the payment of Plaintiff's
17 benefits, all the while professing the need for further documentation, adjustment, discussion and ne-
18 gotiation.

19    19. Plaintiff has negotiated with Defendants at their demand, request and insistence. Defendants
20 delayed payment to Plaintiff of the benefits to which Plaintiff is entitled while falsely claiming to
21 need more time, the desire for further documentation, the wish for additional claims adjustment, dis-
22 cussions and/or negotiations. Defendants have breached said contract by denying insurance cover-
23 age and/or refusing to promptly defend and/or indemnify Plaintiff for the covered losses as required
24 under the terms of said contract and/or denying the terms of the insurance policy itself and protract-
25 ing the adjustment and/or resolution process during which time Defendants would and did retain the
26 use of the money and earn interest thereupon all the while depriving Plaintiff of the same.

27    20. At all times herein alleged, Defendants handled Plaintiff's claim in a manner designed to
28 cause Plaintiff unnecessary time and expense and to harass, oppress and intimidate Plaintiff rather

1    than dealing with Plaintiff in good faith and with the intention of honoring its contractual obligation.

2    By its conduct, Defendants sought to make it cost prohibitive and otherwise difficult for Plaintiff to

3    abandon it.

4        21. Rather than paying Plaintiff's claim promptly and fully, Defendants misled Plaintiff con-

5    cerning her insurance coverage and the valuation of her losses, refused to conduct a thorough and

6    objective investigation and evaluation of Plaintiff's loss, demanded an appraisal in order to delay

7    payment of Plaintiff's losses, and withheld policy benefits from Plaintiff in order to coerce Plaintiff

8    to compromise or abandon her claim for benefits.

9        22. Defendants also forced Plaintiff to incur the expense involved in an appraisal that were nei-

10    ther fair nor impartial. By its conduct, Defendants forced Plaintiff to hire a public adjuster and an

11    attorney in order to compel Defendants to pay the benefits it owes Plaintiff under the policy.

12        23. As a direct and proximate result of the Defendants conduct, Plaintiff has sustained damages

13    in a sum of $25,000.00 or more which represents the jurisdictional limits of this Court and/or in such

14    other and greater sums according to proof as permitted by operation of law at the time of trial to-

15    gether with interest thereon as the legal rate, according to proof at trial and economic loss, including

16    attorney's fees as permitted by operation of law, all to Plaintiff's damage in amounts not presently

17    ascertained. Defendants failed and refused to pay Plaintiff the full value of the loss, thus forcing this

18    litigation and/or have arbitrarily set unreasonable and/or improper time limits not called for at law or

19    under the policy.

20        24. Plaintiff was caused further and other direct and consequential damages the exact nature and

21    extent of which are not known at this time for which an award proximate damages will be sought at

22    the time of trial. Plaintiff seeks prejudgment interest as permitted by law on all damages according

23    to proof at time of trial in a sum within the jurisdictional limits of this Court.

24        25. Further, as with all contracts in the State of California, this insurance contract includes an

25    implied covenant of *good faith* and *fair dealing* that requires Defendants and Does 1 through 50 to

26    place the interests of their insureds in obtaining policy benefits on the same levels as its own inter-

27    ests, that is, defendants have an obligation to give at least as much consideration to the interests of

28    plaintiffs as they do to their own interests.

Complaint – Demand for Jury Trial – Non Waiver of Rights

26. By performing all the conditions, covenants and promises in accordance with the terms and conditions of the *Policy*, Plaintiff reasonably expected to be assured of *"peace of mind"* and financial and economic security and stability for both themselves and their family in the event of loss, damage, or destruction to their residence and/or personal property.

27. Plaintiff is informed and believes that similarly situated individuals have been denied replacement cost, benefits, indemnity and/or defense, notwithstanding the written promises of Defendants, and Plaintiff reserves the right to amend this Complaint to assert the claim of the loss of business and/or individuals whose rights have so violated.

Wherefore, Plaintiff prays for judgment as hereinafter set forth and to the maximum permissible extent allowable.

### For A Second & Distinct Cause of Action – Tortious Breach of Contract – Covenants Of Good Faith and Fair Dealing (Violation Of Common Law Duty) (As Against All Defendants)

28. Plaintiff incorporates by reference paragraphs 1 through 27, inclusive, as if set forth in full herein. The breach of duty owed to Plaintiff described herein violates Defendants' duty to Plaintiff and represents current, past and on-going violations of duty to Plaintiff, both known and unknown to Plaintiff.

29. There was, at all relevant times, an implied covenant of good faith and fair dealing in the contract which Plaintiff had with Defendants that neither party would or will do anything that will injure the rights of the other to receive the benefits of the agreement, in a prompt and timely manner and that Defendants would, in good faith and in the exercise of fair dealing, deal with Plaintiff fairly and honestly and do nothing to impair, interfere with, injure or potentially injure the rights of Plaintiff to receive the benefits of said insurance policy.

30. The duty of good faith and fair dealing is an on-going duty that Defendants have breached and continue to breach by acts and omissions that Plaintiff is currently unaware of.

31. Defendants accepted a duty to honor the contractual obligations of the insurance policy referred to herein and not to withhold payments wrongfully or unreasonably. Such a duty is likewise on going.

32. Defendants had a duty to act in good faith and fairly in handling the claim of Plaintiffs and in paying the benefits due under each contract.

33. Between, or on, or about April 17, 2007, up to and including the present and/or the time of trial, the Defendants engaged in unfair, unlawful, deceptive and/or prohibited business practices and acted in bad faith towards Plaintiff by failing and refusing to comply with California law and the terms and conditions of the contract and failing to act in good faith and deal fairly with Plaintiff and by breaching the common law duties owed to Plaintiff under the terms and conditions of the contract between the parties by, inter alia:

33.1. Failing to properly underwrite the policy of insurance and seeking to take advantage of ambiguities to avoid provision of benefits;

33.2. Conducting improper post claim underwriting in an effort to deny the claim;

33.3. Failing to respond to, act upon and/or acknowledge communications within a reasonable period of time and/or failing to address the specific concerns raised in the communications;

33.4. Failing to transmit communications to appropriate persons, provide necessary instructions, forms and reasonable assistance and begin any necessary investigation and/or processing of the claim and/or failing to request specific information alleged to be necessary to handle Plaintiff's claim;

33.5. Failing to acknowledge and/or act promptly upon the claim including but not limited to failing to promptly, timely, thoroughly and/or properly investigate the claim and thereby improperly and unfairly deny and/or delay payment of the claim on the basis of an incomplete, dilatory investigation and/or inconclusive and/or inconsistent information. Plaintiffs are informed and believes and thereupon alleges that the Defendants hoped that by sitting idly by that they could claim that Plaintiff failed to provide them with sufficient information to adjust and/or properly respond to the claim;

33.6. Failing and/or refusing to adjust the loss and/or proceed with the adjustment and/or appraisal and/or in providing benefits in good faith when a reasonable basis existed therefore.

-----------------------
Complaint – Demand for Jury Trial – Non Waiver of Rights

By delaying the claim and failing to indemnify Plaintiff, Defendants acted in bad faith, sought to keep funds which should have been paid to the insured, and causing Plaintiff reputation to be besmirched in the community in which Plaintiff resides and/or operates, giving Plaintiff a name and reputation as persons who are not concerned with damages that they either caused or are financially responsible for;

33.7.  Delaying the decision making process so as to effectively avoid payment to Plaintiff of Plaintiff's just claim and/or seeking to minimize Defendants' payout by requiring Plaintiff to accept inadequate performance by Defendants, all to Plaintiff's detriment;

33.8.  Failing to adequately and/or properly prepare for meetings, telephone calls and communications, failing to give copies of the insurance policy, its application and other such necessary documents as well as claiming to be unfamiliar with the facts and/or misconstruing the facts in an effort to delay the payment of Plaintiff's claim and force Plaintiff to expend unnecessary and greater sums to facilitate Defendants' "*understanding*" of the claim when such were not required had Defendants made a proper and adequate effort to defend and/or indemnify Plaintiff against the claim which Defendants insured Plaintiff against in the first place;

33.9.  Setting appointments to inspect the premises and failing to keep them to place insureds at a disadvantage in analyzing the claim, construction, building requirements, and the necessary scope of repairs;

33.10.  Failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of Plaintiff's claim for benefits in which liability and/or duty to pay and/or provide such benefits had become reasonable clear by denying the claim, delaying provision of benefits and/or rejecting proofs of loss without a proper basis to do so or to influence settlement under one portion of the policy.  By failing to act in good faith and taking advantage of financial hardship to Plaintiff, Defendants sought to ultimately pay less to Plaintiff while Plaintiff is forced to accept less in settlement than Plaintiff is owed by Defendants in an effort to mitigate their own damages to avoid being worse off than they should have been under the cir-

Complaint – Demand for Jury Trial – Non Waiver of Rights

cumstances. Defendants proceeded in a dilatory manner, delayed the setting and/or taking of Examinations Under Oath and delayed payment of insurance proceeds due to Plaintiff after the loss when the insurer had a duty to promptly provide for all undisputed losses and/or claims;

33.11. Seeking to settle the claim on the basis of Plaintiff's perceived financial need which has no reasonable relationship to Plaintiff's claim under the terms of the insurance policy;

33.12. Fabricating and/or exaggerating disputes and/or engaging in disputes which otherwise should be inconsequential to the gravamen of the claim with Plaintiff thereby failing to timely or properly pay the claim and/or taking unreasonable positions including interpreting the facts, insurance policies and/or applicable law relative to Plaintiff's claim as well as *"adjusting"* the loss in an arbitrary, inappropriate, and unfair manner all in violation of the duty of good faith and fair dealing owed to Plaintiff;

33.13. Placing the interests of the Defendants ahead of the interests of the insured including the retention of insurance premiums and failing to give the legitimate interests of Plaintiff at least equal consideration with the interests of the Defendants. Defendants failed to consider reasonable theories, information, evidence beneficial to Plaintiffs instead of considering theories most advantageous to the Defendants and/or failed to actively seek or obtain a factual foundation with a proper understanding of the loss and casualty and thereby improperly blame Plaintiffs or in an effort to deny or delay payment of the claim and/or improperly reduce the claim due to be paid to Plaintiff and/or failing to properly account for the damages suffered by Plaintiffs in order to minimize Plaintiff's claims;

33.14. Failing to communicate and assist Plaintiff to determine the extent of Defendants' additional liability;

33.15. Failing to provide adequate personnel with proper background to underwrite, investigate, adjust, analyze, handle, assess and/or adjust Plaintiff's claim and/or insurance needs; and failing to respond to communications within a reasonable period of time;

Complaint -- Demand for Jury Trial -- Non Waiver of Rights

33.16. Failing to provide thorough and adequate training to its claims agents and adjusters;

33.17. Failing to provide and/or misrepresenting specific periodic and timely information concerning benefits, claims handling, time limits and other requirements. Not providing a reasonable, competent, explicit and thorough explanation of the basis for failing to adequately process the claim, deciding it or in refusing to settle. Had such information been timely provided it would have allowed Plaintiff to proceed with the claim in a straightforward fashion. Misrepresenting to Plaintiff and/or concealing pertinent facts or insurance policy provisions relating to any damages, defenses, duties and/or coverages, not making it clear what were specifically required and why information were being demanded; disputing coverages without a proper basis and failing to provide a complete copy of the insurance policy after having received several requests;

33.18. Timely accept or deny the claim in whole or in part giving all reasons therefore;

33.19. Seeking information not reasonably required for or material to the resolution of Plaintiff's claimed dispute;

33.20. Failing to obtain reasonable estimates or comparable replacement values to assess and/or appraise the value of the loss in a fair, proper and/or competent manner and/or requiring the insured to use contractors normally hired or used by insurers in preparing bids and/or scopes of the loss by insurers against insureds' will and without guaranteeing the work product and/or financial ability and/or technical competence timely completion thereof;

33.21. Making an offer that is unreasonably low. Understating the damages and failing to provide for repairs of like kind and quality as covered under the policy and making it difficult for insured to repair or replace the damage or obtain the full benefits of the policy. Seeking to compel Plaintiff to accept a lesser sum in settlement of the claim or if Plaintiff persisted in seeking the full measure of their loss, to place Plaintiff in a position to incur substantial detriment, delay and additional expenditures in pursuing enforcement of the claim, all during which time Defendants would retain use of the money. Defendants, in breach of their

covenant of good faith and fair dealing, intentionally, maliciously, and oppressively refused and failed to pay Plaintiff the actual cash value and/or replacement value of the property and/or the any undisputed sums that Defendants owe Plaintiff, compelling Plaintiff to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by insureds, when insureds have made claims for amounts reasonably similar to the amounts ultimately recovered; and attempting to settle a claim with an insured for less than the amount to which a reasonable person would have believed he were entitled by reference to written or printed advertising material published to Plaintiff and/or accompanying or made part of an application;

33.22. Attempting to adjust the loss without a proper basis to do so. Failing to keep adequate and/or losing records, tape recordings, videotapes, minutes and/or notes or the claim and/or adjustment process to properly document progress on the case and to eliminate issues in controversy. Attempting to appraise a claim without reviewing Plaintiff's position or communicating to Plaintiff a position reached by Defendants when Plaintiff has requested information concerning the same to assist Plaintiff in resolving the loss on a just and equitable basis and refusing to assist Plaintiff in analyzing the claim by withholding information from Plaintiffs that would simplify the process of allowing Plaintiff to address the issues of legitimate concern, if any, with Defendants without the need to consume undue amounts of time, expense, money, attorney fees, adjustment fees and other costs and expenses which would thereby contribute to a minimization of Plaintiff's claim;

33.23. Failing without an adequate basis to recognize and/or make prompt, timely payments, provide proper insurance benefits available to the insured who paid for such benefits at a time when said Defendants knew that Plaintiff was entitled to said benefits, and/or arbitrarily cutting off to Plaintiff which would and did unduly and improperly affect and/or influence Plaintiff's settlement of the claim said actions of Defendants were dilatory;

33.24. Misrepresenting the terms of insurance and making untrue, deceptive or misleading statements which, with reasonable care, the Defendants knew or should have known to be

untrue, deceptive or misleading such as misleading Plaintiffs as to the applicable statute of limitations; requiring depreciation not detailed in the policy;

33.25. Failing to provide written notice of the Statute of Limitations or other time periods;

33.26. Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

33.27. Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement;

33.28. Insuring old for new under the replacement cost provisions of the policy of insurance then refusing to pay for the same or then criticizing Plaintiff for making a replacement cost claim while requiring Plaintiff to *"replace"* various insured items that had been the subject of a casualty without at least tendering adequate payment for the same before Defendants would pay Plaintiff all or part of the insurance proceeds which Plaintiff needs to replace such items. The requirement made of Plaintiff was designed to make it difficult and/or impossible for Plaintiff to actually replace the items in questions and thereby allow Defendants to make claim that Plaintiff failed and/or refused to live up to the terms of the policy in order to avoid payment of replacement costs due to Plaintiffs under the terms of and conditions of Plaintiff's insurance policy. Defendants would not make appropriate replacement arrangements which deprived Plaintiff of the use, enjoyment and benefits under the policy of insurance and failed to inform Plaintiff of the replacement cost issues and/or other problems, if any, associated with said claim, at least by Defendants;

33.29. Adopting and/or carrying out arbitrary, unreasonable and/or capricious standards with respect to the assessment of the claim, defense of Plaintiff, law, facts, events and/or the adjustment of the issues present in the claim thereby acting in bad faith, and/or alternatively

failing to adopt, implement and/or enforce reasonable standards for the prompt investigation, processing, and/or resolution of the claim thereby denying and/or delaying payment to Plaintiff and/or violating the implied covenant of good faith and fair dealing;

33.30. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured;

33.31. Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

33.32. Requesting multiple proofs of loss and/or repeated or unnecessary documentation and/or taking of repeated Examination Under Oath of the same similar and identical claims, losses and/or materials when such production or repetition were not necessary or appropriate to the circumstances of the case all delaying the claim and/or depriving Plaintiff of benefits contracted for under the insurance policy, and/or unreasonably requiring Plaintiff to produce papers and records, including those which were damaged, destroyed and/or lost in the casualty or for which Plaintiff or persons in Plaintiff's position would not normally keep or make a part of the usual, customary and/or normal records. Further said defendants have proceeded to repeat questions and seek the same information already provided thereby causing unjustified delay in the resolution of the claim all the while the defendants keep the money which should be used to defend and/or indemnify Plaintiff and earn interest thereupon while Plaintiffs is deprived of insurance benefits contracted for;

33.33. Engaging in false and/or deceptive advertising and/or business practices;

33.34. Seeking to claim that the action of Defendants' agents including spoliation of evidence are attributable to Plaintiff in an effort to deny coverage and/or defense and/or indemnification;

33.35. Failing to comport themselves to the reasonable expectations of the insured in handling the claim, adjusting the loss, providing coverage, indemnification and/or defense and thereby causing the insured to suffer from compensatable emotional distress, loss of peace of mind and tranquility, financial loss and/or damage;

33.36. Failing to promptly notify Plaintiff of remedial rights available to Plaintiff under the contract in order that Plaintiff might secure the benefits Plaintiff contracted;

33.37. Conditionally paying benefits to Plaintiff when it were unreasonable to do; and

33.38. Defendants have breached their duty of fair dealing and good faith owed to Plaintiff by these and other acts and omissions which the Plaintiff is currently unaware of. Plaintiff will seek leave of the Court to amend this complaint alleging such acts, conduct and omissions, if necessary, at such time or times as the Plaintiff becomes aware of the same and/or at time of trial.

34. The failure of Defendants to provide benefits in a prompt and timely manner as required under the *contract of insurance* and *California Law* and as represented to Plaintiff by Defendants and Defendants *unfair* and *abusive* tactics are without just or reasonable cause. Defendants knew that said conduct is directly contrary to law and the terms and conditions of the policy. Plaintiff has at all times cooperated with Defendants and have performed all conditions of the policy.

35. In breaching the *covenant of good faith and fair dealing*, Defendants' conduct were committed with the authorization and ratification of managerial and supervisorial claims and other personnel with authority to resolve the claim and done with a conscious disregard of Plaintiff's rights and with the intent to vex, injure or annoy Plaintiff, such as to constitute oppression, fraud or malice under *Civ. Code § 3294* thereby entitling Plaintiff to punitive damages in an amount according to proof at the time of trial as permitted by operation of law.

36. As a further direct and proximate result of the Defendants conduct, Plaintiff has sustained consequential damages according to proof as allowed by operation of law at the time of trial and other damages under said insurance contract and Plaintiff has sustained severe emotional distress as permitted by operation of law according to proof at the time of trial and economic loss, including attorney's fees while attempting to recover the amount due them under the policy of insurance, all to Plaintiff's damage in amounts not presently ascertained as well as other consequential and general damages which Plaintiff will seek to recoup at the time of trial.

Complaint – Demand for Jury Trial – Non Waiver of Rights

Wherefore, Plaintiff prays for judgment as hereinafter set forth and to the maximum permissible extent allowable.

## Demand for Jury Trial

A jury trial in the above-entitled matter is hereby demanded.

## Prayer for Relief

Wherefore, without expressly waiving any rights herein and reserving all rights, Plaintiff prays for judgment against each of Defendants as follows:

1. For the sum of $25,000.00 and such other general damages and compensation, including but not limited to injuries resulting from humiliation, repeated anguish and emotional distress according to proof at the time of trial as permitted by operation of law;

2. For special and/or other consequential damages as permitted by operation of law and according to proof at the time of trial;

3. For additional and/or any damages and/or relief as permitted by *Ins. Code § 2057 et seq.*;

4. In the alternative, in accordance with the notice requirements of *Code Civ. Proc. § 425.10*, and due process, Plaintiff prays for judgment as allowed by operation of law and according to proof up to and including the sum of $1,000,000.00 in addition to and/or in lieu of any other allowable damages sought herein in the event that a default is entered. This request for damages conforms to the due process requirements for judgments in the event of default under both California and federal law but is not intended or offered to determine diversity under *United States Constitution, Article III, § 2* and *28 U.S.C. § 1332* or constitute proof or admissible evidence for a determination of federal diversity.

5. For interest at the rate of 10 percent per annum or as permitted by operation of law;

6. For costs of suit herein incurred as permitted by operation of law according to proof;

7. For prejudgment interest as permitted by operation of law according to proof at the time of trial;

8. For reasonable attorneys' fees, costs and expenses as permitted by operation of law according to proof at the time of trial; and

Complaint – Demand for Jury Trial – Non Waiver of Rights

1    9. For such other and further relief as the court may deem just and proper.

2    Dated:  04/10/08

3    _____
     Marcus Daniel Merchasin
     Attorney at Law

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint – Demand for Jury Trial – Non Waiver of Rights

*Gilton*

# Alternative Dispute Resolution (ADR) Program Information Package

# Alternatives to Trial

## There are other ways to resolve a civil dispute.

**The plaintiff must serve a copy of the ADR information package on each defendant along with the complaint. (CRC 201.9(c))**

**Superior Court of California**
**County of San Francisco**

## Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

## Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can save time.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR encourages participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR is flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

1) Judicial Arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called judicial arbitration. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties

ADR-1   10/07 (ja)                                                    Page 4

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is <u>not</u> binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

### Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

# MEDIATION

### Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

### Operation

San Francisco Superior Court Local Court Rule 4 provides three different voluntary mediation programs for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

### Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

### Mediation Services of the Bar Association of San Francisco

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties. It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process. Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, parties select a specific mediator from the list of court approved mediation providers. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-782-9000.

### Judicial Mediation

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

## *Cost*

Generally, the cost of Private Mediation ranges from $200 per hour to $400 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $200 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### *Description*

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### *Operation*

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If a matter is assigned to the ESP by the Court, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

### Cost

All parties must submit a $250 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 782-9000 ext. 8717.

* * * * * * * * * * * * * * * * * * * *

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution,
400 McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO
### 400 McAllister Street, San Francisco, CA  94102-4514

|  |  |
|---|---|
| **Plaintiff**<br><br>v.<br><br>**Defendant** | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

| | | | |
|---|---|---|---|
| ☐ | **Private Mediation** ☐ | **Mediation Services of BASF** | ☐ **Judicial Mediation** |
| ☐ | **Binding arbitration** | | Judge _____ |
| ☐ | **Non-binding judicial arbitration** | | Judge _____ |
| ☐ | **BASF Early Settlement Program** | | |
| ☐ | **Other ADR process (describe)** _____ | | |

Plaintiff(s) and Defendant(s) further agree as follows:

_____

_____

_____

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant | | Dated:_____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant | | Dated:_____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant | | Dated:_____ |

☐ *Additional signature(s) attached*

ADR-2  3/06          **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:                     FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | | CASE NUMBER: |
|---|---|---|
| (Check one): ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) | ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                    Time:              Dept.:           Div.:              Room:

Address of court (if different from the address above):

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** (answer one):
   a. ☐ This statement is submitted by party (name):
   b. ☐ This statement is submitted jointly by parties (names):

2. **Complaint and cross-complaint** (to be answered by plaintiffs and cross-complainants only)
   a. The complaint was filed on (date):
   b. ☐ The cross-complaint, if any, was filed on (date):

3. **Service** (to be answered by plaintiffs and cross-complainants only)
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served (specify names and explain why not):

      (2) ☐ have been served but have not appeared and have not been dismissed (specify names):

      (3) ☐ have had a default entered against them (specify names):

   c. ☐ The following additional parties may be added (specify names, nature of involvement in case, and the date by which they may be served):

4. **Description of case**
   a. Type of case in  ☐ complaint   ☐ cross-complaint    (describe, including causes of action):

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

**CASE MANAGEMENT STATEMENT**

Page 1 of 4
Cal. Rules of Court,
rules 3.720-3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b.  Provide a brief statement of the case, including any damages. (If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date (indicate source and amount), estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)

☐  (If more space is needed, check this box and attach a page designated as Attachment 4b.)

5.  **Jury or nonjury trial**
The party or parties request    ☐ a jury trial    ☐ a nonjury trial    (If more than one party, provide the name of each party requesting a jury trial):

6.  **Trial date**
a.  ☐ The trial has been set for (date):
b.  ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint (if not, explain):

c.  Dates on which parties or attorneys will not be available for trial (specify dates and explain reasons for unavailability):

7.  **Estimated length of trial**
The party or parties estimate that the trial will take (check one):
a.  ☐ days (specify number):
b.  ☐ hours (short causes) (specify):

8.  **Trial representation** (to be answered for each party)
The party or parties will be represented at trial    ☐ by the attorney or party listed in the caption    ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐ Additional representation is described in Attachment 8.

9.  **Preference**
☐ This case is entitled to preference (specify code section):

10. **Alternative Dispute Resolution (ADR)**
a.  Counsel    ☐ has    ☐ has not    provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐ All parties have agreed to a form of ADR. ADR will be completed by (date):
c.  ☐ The case has gone to an ADR process (indicate status):

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.    The party or parties are willing to participate in (check all that apply):
    (1) ☐ Mediation
    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
    (4) ☐ Binding judicial arbitration
    (5) ☐ Binding private arbitration
    (6) ☐ Neutral case evaluation
    (7) ☐ Other (specify):

    e.    ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
    f.    ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
    g.    ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court (specify exemption):

11. **Settlement conference**
    ☐ The party or parties are willing to participate in an early settlement conference (specify when):

12. **Insurance**
    a.    ☐ Insurance carrier, if any, for party filing this statement (name):
    b.    Reservation of rights:    ☐ Yes    ☐ No
    c.    ☐ Coverage issues will significantly affect resolution of this case (explain):

13. **Jurisdiction**
    Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
    ☐ Bankruptcy    ☐ Other (specify):
    Status:

14. **Related cases, consolidation, and coordination**
    a.    ☐ There are companion, underlying, or related cases.
        (1) Name of case:
        (2) Name of court:
        (3) Case number:
        (4) Status:
    ☐ Additional cases are described in Attachment 14a.
    b.    ☐ A motion to    ☐ consolidate    ☐ coordinate    will be filed by (name party):

15. **Bifurcation**
    ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action (specify moving party, type of motion, and reasons):

16. **Other motions**
    ☐ The party or parties expect to file the following motions before trial (specify moving party, type of motion, and issues):

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**
  a. ☐ The party or parties have completed all discovery.
  b. ☐ The following discovery will be completed by the date specified (describe all anticipated discovery):

     **Party**                    **Description**                        **Date**

  c. ☐ The following discovery issues are anticipated (specify):

**18. Economic Litigation**
  a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
  b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed (if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):

**19. Other Issues**
  ☐ The party or parties request that the following additional matters be considered or determined at the case management conference (specify):

**20. Meet and confer**
  a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court (if not, explain):

  b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following (specify):

**21. Case management orders**
  Previous case management orders in this case are (check one):   ☐ none   ☐ attached as Attachment 21.

**22. Total number of pages attached (if any): _____**

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

▶ _____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

▶ _____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached

**CASE MANAGEMENT STATEMENT**



# Superior Court of California
## County of San Francisco

**HON. DAVID BALLATI**
**PRESIDING JUDGE**

## Judicial Mediation Program

**JENNFER B. ALCANTARA**
**ADR PROGRAM ADMINISTRATOR**

The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable David J. Ballati
The Honorable Anne Bouliane
The Honorable Ellen Chaitin
The Honorable Robert L. Dondero
The Honorable Ernest H. Goldsmith
The Honorable Harold E. Kahn
The Honorable Patrick J. Mahoney
The Honorable Tomar Mason

The Honorable James J. McBride
The Honorable Kevin M. McCarthy
The Honorable John E. Munter
The Honorable Ronald Quidachay
The Honorable A. James Robertson, II
The Honorable John K. Stewart
The Honorable Mary E. Wiss

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Program Administrator will facilitate assignment of cases that qualify for the program.

Note: Space is limited. Submission of a stipulation to judicial mediation does not guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

10/07 (ja)

Gilton

CASE NUMBER: CGC-08-474148  DORIS J. GILTON VS. ALLSTATE INSURANCE COMPANY

## NOTICE TO PLAINTIFF

A Case Management Conference is set for

| | | |
|---|---|---|
| **DATE:** | **SEP-12-2008** | |
| **TIME:** | **9:00AM** | |
| **PLACE:** | **Department 212** | |
| | **400 McAllister Street** | |
| | **San Francisco, CA  94102-3680** | |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order without an appearance at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL. (SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

MAY 2 2 2008

GORDON PARK-LI, Clerk
BY: _____MARIA SANCHEZ_____
                              Deputy Clerk

1  CYNTHIA L. MELLEMA (State Bar No. 122798)
2  JEFFRY BUTLER (State Bar No. 180936)
   MEGAN L. DUNHAM (State Bar No. 245991)
3  SONNENSCHEIN NATH & ROSENTHAL LLP
   2121 N California Blvd., Suite 800
4  Walnut Creek, CA 94596
   Telephone: (925) 949-2600
5  Facsimile: (925) 949-2610,
   Email:     cmellema@sonnenschein.com
6              jbutler@sonnenschein.com
              mdunham@sonnenschein.com

7  Attorneys for Defendant
   ALLSTATE INSURANCE COMPANY

8

9                SUPERIOR COURT OF CALIFORNIA

10                 COUNTY OF SAN FRANCISCO

11

12  DORIS J. GILTON,                      |  No. CGC 08 474148

13          Plaintiff,                    |  DEFENDANT ALLSTATE INSURANCE
                                          |  COMPANY'S ANSWER TO PLAINTIFF'S
14     vs.                                |  COMPLAINT

15  ALLSTATE INSURANCE COMPANY,
   and DOES 1 through 50, inclusive,

16

17          Defendants.

18

19     Defendant Allstate Insurance Company ("Allstate") hereby answers the Complaint of

20  plaintiff Doris Gilton (the "Complaint") as follows:

21                        **GENERAL DENIAL**

22     Pursuant to Code of Civil Procedure section 431.30(d), Allstate generally denies the

23  material allegations of plaintiff's Complaint, and each cause of action against Allstate contained

24  therein. Further, Allstate denies that plaintiff has suffered any damages as alleged in the

25  Complaint, or in any amount or at all, due to any act, error or omission of Allstate.

26  / / /

27  / / /

28  / / /

1

No. CGC 08 474 148                                         ALLSTATE'S ANSWER TO
                                                           PLAINTIFF'S COMPLAINT

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

1

## AFFIRMATIVE DEFENSES

2

(Applicable To All Causes of Action)

3

### First Defense

4

### (Failure to State a Cause of Action)

5

The Complaint, and each and every purported cause of action therein, fails to state facts

6

sufficient to constitute a cause of action against Allstate.

7

### Second Defense

8

### (Waiver)

9

The Complaint, and each and every purported cause of action therein, is barred against

10

Allstate by the doctrine of waiver.

11

### Third Defense

12

### (Estoppel)

13

The Complaint, and each and every purported cause of action therein, is barred against

14

Allstate by the doctrine of estoppel.

15

### Fourth Defense

16

### (Laches)

17

The Complaint, and each and every purported cause of action therein, is barred against

18

Allstate by the doctrine of laches.

19

### Fifth Defense

20

### (Unclean Hands)

21

The Complaint, and each and every purported cause of action therein, is barred against

22

Allstate by the doctrine of unclean hands.

23

### Sixth Defense

24

### (Fault of Others)

25

Plaintiff's damages, the fact and extent of which Allstate denies, were either wholly or

26

partially caused by and/or contributed to by the fault of others, whether that fault be the

27

proximate result of intentional conduct, negligence, breach of contract, or any other type of fault,

28

of persons, firms, corporations or entities other than Allstate, for which Allstate is not

2

ALLSTATE'S ANSWER TO
PLAINTIFF'S COMPLAINT

1    responsible.  Such intentional conduct, negligence or fault bars recovery against Allstate or

2    comparatively reduces the percentage of fault or negligence, if any, of Allstate.

3                                   **Seventh Defense**

4                              **(Active Fault of Plaintiff)**

5        The Complaint, and each and every purported cause of action in the Complaint, is barred

6    by the active fault of plaintiff.

7                                   **Eighth Defense**

8                                **(Comparative Fault)**

9        The Complaint, and each and every purported cause of action in the Complaint, is barred

10   and/or plaintiff's recovery is reduced because plaintiff's alleged damages were the result of

11   plaintiff's comparative fault.

12                                   **Ninth Defense**

13                                  **(No Causation)**

14       Plaintiff is not entitled to relief from Allstate because she has not sustained any injury,

15   damage or loss by reason of any conduct, act, error or omission on Allstate's part.

16                                   **Tenth Defense**

17                               **(Intervening Cause)**

18       Plaintiff's damages, the fact and extent of which Allstate denies, were proximately

19   caused by intervening, superseding and/or supervening acts for which Allstate has no liability.

20                                  **Eleventh Defense**

21                              **(Mitigation of Damages)**

22       Plaintiff's recovery against Allstate, if any, is barred and/or limited to the extent plaintiff

23   has failed to mitigate, minimize or avoid any damages she has allegedly suffered.

24                                  **Twelfth Defense**

25                                    **(Set-Off)**

26       To the extent Allstate is liable to plaintiff, if at all, Allstate is entitled to a set-off on

27   account of damages sustained by Allstate as a result of plaintiff's acts, conduct or omissions.

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

## Thirteenth Defense

### (Speculative Nature of Damages)

Plaintiff is not entitled to judgment because her damages claims are speculative.

## Fourteenth Defense

### (Election of Remedies)

To the extent Plaintiff has elected to pursue a certain remedy, she is barred from pursuing or recovering under any other remedy under the doctrine of election of remedies.

## Fifteenth Defense

### (Appraisal)

Plaintiff's claim for policy benefits is subject in whole or in part to appraisal under the subject insurance policy.

## Sixteenth Defense

### (Privilege)

Allstate's alleged acts, conduct and/or omissions were lawful, privileged and/or justified.

## Seventeenth Defense

### (Accord and Satisfaction)

The Complaint, and each and every purported cause of action therein, is barred by the doctrine of accord and satisfaction.

## Eighteenth Defense

### (Ratification of Conduct)

With full knowledge of all facts in any way connected with or relating to the matters alleged in the Complaint, plaintiff duly ratified, acquiesced and/or confirmed in all respects the conduct and/or omissions of Allstate alleged in the Complaint.

## Nineteenth Defense

### (Assumption of Risk)

Plaintiff knew, or in the exercise of reasonable care should have known, the risks of the matters alleged in the Complaint. Plaintiff knowingly and voluntarily assumed and accepted

4

ALLSTATE'S ANSWER TO
PLAINTIFF'S COMPLAINT

1    such risks, and any damages allegedly suffered by plaintiff were the proximate result of

2    plaintiff's assumptions and acceptance of such risks.

### Twentieth Defense

### (Consent and/or Authorization of Plaintiff)

5    Plaintiff consented to and/or authorized all conduct and/or omissions of Allstate alleged

6    in the Complaint.

### Twenty-First Defense

### (No Coverage for Claimed Losses)

9    The Complaint, and each and every purported cause of action therein, is barred to the

10   extent that it seeks payment, reimbursement, contribution, or indemnification for, or is based on,

11   a loss that is not covered by, or is excluded from, coverage under the terms, exclusions,

12   conditions and limitations of the subject insurance policy.

### Twenty-Second Defense

### (Allstate's Compliance With Obligations)

15   Allstate fully performed all obligations, both express and implied, if any, owed to

16   plaintiff under the subject insurance policy and applicable law.

### Twenty-Third Defense

### (Plaintiff's Failure to Comply With Policy Terms)

19   The Complaint is barred to the extent the Plaintiff has failed to perform all of her

20   obligations under the subject insurance policy, including her duty to cooperate with Allstate in

21   the processing of claims and to document and substantiate her claimed losses.

### Twenty-Fourth Defense

### (Obligations Limited to Policy Terms)

24   Allstate's obligations, if any, to plaintiff are governed and limited by the terms,

25   definitions, exclusions, conditions, and limitations contained in the subject insurance policy.

26

27

28

No. CGC 08 474 148

ALLSTATE'S ANSWER TO
PLAINTIFF'S COMPLAINT

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

1

2

### Twenty-Fifth Defense

### (Loss Already Paid)

The Complaint, and each and every purported cause of action therein, is barred in that it seeks payment, reimbursement, contribution, or indemnification for, or is based on, losses that were already paid under the subject insurance policy.

### Twenty-Sixth Defense

### (Policy Limits)

The subject insurance policy provides cover, if at all, only to the extent of limits of liability listed on its declaration page.

### Twenty-Seventh Defense

### (Statute of Limitations)

The Complaint is barred by the applicable statutes of limitations, including, but not limited to, California Code of Civil Procedure section 337(1), 337(2), 338(a), (b), (d) and/or (j), 339, 340, 340.6, 340.8 and 343, and Insurance Code sections 2070 and/or 2071.

### Twenty-Eighth

### (Contractual Limitations Period)

The subject insurance policy requires that any suit or action be brought within one (1) year after the date of loss. The statute is tolled from the date of tender to the date of denial. *Prudential-LMI Com. Ins. v. Sup. Ct.*, 51 Cal. 3d 674 (1990); Cal. Ins. Code § 2071. Plaintiff is barred from recovery if she failed to bring this action within the one year contractual limitations period.

### Twenty-Ninth Defense

### (Reasonableness of Allstate)

Allstate's conduct was at all times reasonable and not tortious.

### Thirtieth Defense

### (Plaintiff's Claim Raised Genuine Issues)

Plaintiff should take nothing pursuant to the Complaint because her claims to Allstate raised genuine issues and/or disputes as to Allstate's duties, if any, under the subject insurance

6

ALLSTATE'S ANSWER TO
PLAINTIFF'S COMPLAINT

1    policy at issue in the Complaint, and Allstate's belief in the validity of these issues and/or

2    disputes was reasonable.

### Thirty-First Defense

### (No Punitive or Non-Compensatory Damages)

5    The Complaint fails to state facts sufficient to entitle plaintiff to punitive damages.

### Thirty-Second Defense

### (Unconstitutionality of Punitive Damages)

8    Plaintiff's claim for punitive damages is barred because the California punitive damages

9    statute is unconstitutional in that, among other things, it is void for vagueness, violates the equal

10    protection clause, violates the due process clause, is an undue burden on interstate commerce,

11    violates the contract clause, and violates the Eighth Amendment proscription against excessive

12    fines pursuant to the United States and California Constitutions.

### Thirty-Third Defense

### (No Entitlement to Attorneys' Fees)

15    Plaintiff is precluded from recovering attorneys' fees and costs from Allstate under

16    applicable provisions of the law.

### Thirty-Fourth Defense

### (Right To Assert Additional Defenses)

19    Allstate reserves the right to amend the right to amend this Answer and to assert any

20    additional defenses in the future after conducting discovery.

21    WHEREFORE, Allstate prays for judgment as follows:

22        1.    That Plaintiff take nothing by way of her Complaint;

23        2.    That the Complaint be dismissed with prejudice and judgment entered in favor of

24            Allstate;

25        3.    That Allstate be awarded costs and attorneys' fees incurred in this action; and

26        4.    For such other and further relief as this Court deems just and proper.

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

7

1    Dated: May 2/, 2008                    Respectfully submitted,

2                                           SONNENSCHEIN NATH & ROSENTHAL LLP

3

4                                           By _____

5                                                  Megan L. Dunham

6                                           Attorneys for Defendant
                                            ALLSTATE INSURANCE COMPANY
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 NORTH CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2600

No. CGC 08 474 148                                    8                    ALLSTATE'S ANSWER TO
                                                                           PLAINTIFF'S COMPLAINT

1

## PROOF OF SERVICE

2    I, Gloria Courtney, hereby declare:

3    I am employed in the City of Walnut Creek, and in the County of Contra Costa, California,

4    in the office of a member of the bar of this court at whose direction the following service was

5    made. I am over the age of eighteen years and not a party to the within action. My business

6    address is Sonnenschein, Nath & Rosenthal, LLP, 2121 North California Blvd., Suite 800,

7    Walnut Creek, California 94596-7342.

8    On May 21, 2008, I caused to be served on the interested parties in this action the

9    following document(s):

10    **DEFENDANT ALLSTATE INSURANCE COMPANY'S**

11    **ANSWER TO PLAINTIFF'S COMPLAINT**

12    by placing a true copy(ies) thereof, on the above date, enclosed in a sealed envelope, following

13    the ordinary business practice of Sonnenschein Nath & Rosenthal LLP, as follows:

14    Marcus Daniel Merchasin                          Attorney for Plaintiff
       Attorney and Counselor at Law                    DORIS J. GILTON

15    582 Market Street, Suite 1400
       San Francisco, CA 94104

16
       Telephone: (415) 678-2700

17

18    ☒    U.S. MAIL: I am personally and readily familiar with the business practice of

19    Sonnenschein Nath & Rosenthal LLP for collection and processing of correspondence for
       mailing with the United States Postal Service, pursuant to which mail placed for collection at

20    designated stations in the ordinary course of business is deposited the same day, proper postage
       prepaid, with the United States Postal Service.

21

22    ☐    FACSIMILE TRANSMISSION: I caused such document to be sent by facsimile
       transmission at the above-listed fax number for the party.

23    I declare under penalty of perjury under the laws of the State of California that the

24    foregoing is true and correct, and that this declaration was executed on May 21, 2008, at

25    Walnut Creek, California.

26

27                                                              _Gloria Courtney_
                                                                Gloria Courtney

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N. CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CA 94596-7342
(925) 949-2600

# EXHIBIT B

1   CYNTHIA L. MELLEMA (State Bar No. 122798)
    JEFFRY BUTLER (State Bar No. 180936)
2   MEGAN L. DUNHAM (State Bar No. 245991)
    SONNENSCHEIN NATH & ROSENTHAL LLP
3   2121 N California Blvd., Suite 800
    Walnut Creek, CA 94596
4   Telephone: (925) 949-2600
    Facsimile: (925) 949-2610
5   Email:    cmellema@sonnenschein.com
              jbutler@sonnenschein.com
6             mdunham@sonnenschein.com

7   Attorneys for Defendant
    ALLSTATE INSURANCE COMPANY
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13  DORIS J. GILTON,                        No.

14              Plaintiff,                   REQUEST FOR JUDICIAL NOTICE IN
                                            SUPPORT OF DEFENDANT ALLSTATE
15       vs.                                 INSURANCE COMPANY'S NOTICE OF
                                            REMOVAL
16  ALLSTATE INSURANCE COMPANY,
    and DOES 1 through 50, inclusive,
17
                Defendants.
18

19

20

21  Pursuant to Federal Rule of Evidence 201, Defendant Allstate Insurance Company requests that

22  the Court take judicial notice of the following documents in support of its Notice of Removal:

23       1.    Allstate Insurance Company's profile on file with the California Department of

24  Insurance showing that it is a citizen and residence of Northbrook, Illinois.  A true and correct

25  copy of Allstate's profile from the Department of Insurance website is attached hereto as Exhibit

26  1.

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N. CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2635

- 1 -

1        2.    Allstate Insurance Company's rating and report from Best's Insurance Reports

2    showing that it is incorporated under the laws of Illinois.  A true and correct copy of Best's

3    Insurance Reports is attached hereto as Exhibit 2.

4        3.    The following Federal cases recognizing that Allstate Insurance Company is

5    incorporated in and has its principal place of business in Illinois.  *See Griffin v. Allstate Ins. Co.*,

6    1995 U.S. Dist. LEXIS 11126 (C.D. Cal. Aug. 1, 1995) *Farrugia v. Allstate Ins. Co.*, 2007 U.S.

7    Dist. LEXIS 22628 (N.D. Cal. Mar. 8, 2007).  A true and correct copy of these cases is attached

8    hereto as Exhibit 3.

9

10                          Respectfully submitted,

11    Dated: May 22, 2008             SONNENSCHEIN NATH & ROSENTHAL LLP

12

13

14                        By    Cynthia L. Mellema

15                              Cynthia L. Mellema

16                          Attorneys for Defendant
                  ALLSTATE INSURANCE COMPANY

17    27299058

18

19

20

21

22

23

24

25

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N. CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596-7342
(925) 949-2635

**EXHIBIT 1**

# Company Profile

# ALLSTATE INSURANCE COMPANY
## 3075 SANDERS ROAD, STE. H1A
## NORTHBROOK, IL 60062-7127
## 800-386-6126

**Agent for Service of Process**
JERE KEPRIOS, C/O CT CORPORATION SYSTEM 818 WEST SEVENTH STREET, 2ND FLOOR
LOS ANGELES, CA 90017
Unable to Locate the Agent for Service of Process?

## Reference Information

| | |
|---|---|
| NAIC #: | 19232 |
| NAIC Group #: | 0008 |
| California Company ID #: | 1117-1 |
| Date authorized in California: | October 23, 1931 |
| License Status: | UNLIMITED-NORMAL |
| Company Type: | Property & Casualty |
| State of Domicile: | ILLINOIS |

## Lines of Insurance Authorized to Transact

The company is authorized to transact business within these lines of insurance. For an explanation of any of these terms, please refer to the glossary.

AIRCRAFT
AUTOMOBILE
BOILER AND MACHINERY
BURGLARY
COMMON CARRIER LIABILITY
CREDIT
DISABILITY
FIRE
LEGAL INSURANCE
LIABILITY
MARINE
MISCELLANEOUS

PLATE GLASS
SPRINKLER
SURETY
TEAM AND VEHICLE
WORKERS' COMPENSATION

# Company Complaint Information

Company Enforcement Action Documents
Company Performance & Comparison Data
Composite Complaint Studies

# Want More?

Help Me Find a Company Representative in My Area

Financial Rating Organizations

Last Revised - May 07, 2008 02:35 PM
Copyright © California Department of Insurance

# EXHIBIT 2

IMPORTANT NOTICE

# *BEST'S*
# INSURANCE REPORTS®
## Property/Casualty
## United States & Canada

## 2007 Edition
## Volume I

### United States
### A – J

### Best's Ratings and Reports
### are as of publication date July 23, 2007

For Current Ratings and Reports access *www.ambest.com*

Published Continuously Since 1900



**A.M. BEST COMPANY**

Oldwick, New Jersey 08858 USA • (908) 439-2200 • Fax: (908) 439-3296
www.ambest.com

ALLSTATE INSURANCE COMPANY

## BALANCE SHEET
### ADMITTED ASSETS ($000)

| | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| Bonds | 118,980 | 107,892 | 86.0 | 94.4 |
| Common stock | 363 | 4 | 0.3 | 0.0 |
| Cash & short-term invest | 5,856 | 4,214 | 4.2 | 3.7 |
| Other non-affil inv asset | 5,249 | 55 | 3.8 | 0.0 |
| Total invested assets | 130,447 | 112,164 | 94.3 | 98.1 |
| Accrued interest | 1,922 | 1,572 | 1.4 | 1.4 |
| All other assets | 5,975 | 585 | 4.3 | 0.5 |
| Total assets | 138,345 | 114,321 | 100.0 | 100.0 |

### LIABILITIES & SURPLUS ($000)

| | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| All other liabilities | 6,815 | 3,308 | 4.9 | 2.9 |
| Total liabilities | 6,815 | 3,308 | 4.9 | 2.9 |
| Capital & assigned surplus | 32,200 | 17,200 | 23.3 | 15.0 |
| Unassigned surplus | 99,330 | 93,813 | 71.8 | 82.1 |
| Total policyholders' surplus | 131,530 | 111,013 | 95.1 | 97.1 |
| Total liabilities & surplus | 138,345 | 114,321 | 100.0 | 100.0 |

### SUMMARY OF 2006 OPERATIONS ($000)

| Statement of Income | 12/31/06 | Funds Provided from Operations | 12/31/06 |
|---|---|---|---|
| Premiums earned | ... | Premiums collected | 63 |
| Losses incurred | ... | Benefit & loss related pmts | -247 |
| Net underwriting income | ... | Undrw cash flow | 310 |
| Net investment income | 6,124 | Investment income | 5,625 |
| Pre-tax oper income | 6,124 | Pre-tax cash operations | 5,935 |
| Realized capital gains | 44 | | |
| Income taxes incurred | 680 | Income taxes pd (recov) | 628 |
| Net income | 5,488 | Net oper cash flow | 5,307 |

◆

## Allstate Insurance Group

**Ultimate Parent: Allstate Corporation**
**ALLSTATE INSURANCE COMPANY**
Northbrook, IL
3075 Sanders Road, Suite H1A, Northbrook, IL 60062-7127
Web: www.allstate.com

Tel: 847-402-5000.            Fax: 847-402-9116
AMB#: 02017                    NAIC#: 19232
Ultimate Parent#: 58312        FEIN#: 36-0719665

### BEST'S RATING
Based on our opinion of the consolidated Financial Strength of the property/casualty members of Allstate Insurance Group, which operate under a group structure, each group member is assigned a Best's Rating of A+ (Superior). The company is assigned the Financial Size Category of Class XV, which is the Financial Size Category of the group. Refer to the Preface for a complete explanation of Best's Rating system and procedure.

### RATING RATIONALE
For a detailed discussion of the rating rationale, refer to the report of Allstate Insurance Group.

**Best's Rating: A+ g**                    **Outlook: Stable**

### FIVE YEAR RATING HISTORY
Rating as of July 23, 2007: A+ g

| Date | Best's Rating | Date | Best's Rating |
|---|---|---|---|
| 02/06/07 | A+ g | 02/18/04 | A+ g |
| 11/07/05 | A+ g | 06/12/03 | A+ g |
| 06/10/05 | A+ g | 01/17/03 | A+ g |
| 06/15/04 | A+ g | | |

### KEY FINANCIAL INDICATORS ($000)

| | | | Statutory Data | | | |
|---|---|---|---|---|---|---|
| Period Ending | Direct Premiums Written | Net Premiums Written | Pretax Operating Income | Net Income | Total Admitted Assets | Policy-holders' Surplus |
| 2002 | 13,842,614 | 21,906,569 | 1,811,232 | 1,433,633 | 39,100,283 | 13,760,543 |
| 2003 | 14,039,507 | 22,961,893 | 2,830,197 | 2,712,523 | 42,690,593 | 16,100,583 |
| 2004 | 13,920,208 | 24,133,262 | 4,788,242 | 3,863,547 | 44,711,746 | 16,766,722 |
| 2005 | 13,606,484 | 25,081,370 | 1,554,232 | 1,749,964 | 45,243,615 | 14,833,660 |
| 2006 | 12,854,656 | 25,167,488 | 6,635,635 | 4,921,523 | 47,679,725 | 19,129,160 |

| | Profitability | | | Leverage | | | Liquidity | |
|---|---|---|---|---|---|---|---|---|
| Period Ending | Comb. Ratio | Inv. Yield (%) | Pretax ROR (%) | NA Inv Lev | NPW to PHS | Net Lev. | Overall Liq. (%) | Oper. Cash-flow (%) |
| 2002 | 100.4 | 5.5 | 8.5 | 33.6 | 1.6 | 3.4 | 154.6 | 108.3 |
| 2003 | 95.9 | 5.2 | 12.6 | 37.6 | 1.4 | 3.1 | 160.0 | 116.5 |
| 2004 | 89.0 | 5.6 | 20.3 | 41.1 | 1.4 | 3.1 | 161.0 | 118.7 |
| 2005 | 103.0 | 5.7 | 6.3 | 50.7 | 1.7 | 3.7 | 149.3 | 112.1 |
| 2006 | 84.5 | 6.5 | 26.5 | 49.3 | 1.3 | 2.8 | 167.9 | 113.2 |
| 5-Yr | 94.4 | 5.7 | 15.0 | ... | ... | ... | ... | ... |

(*) Data reflected within all tables of this report has been compiled from the company-filed statutory statement. Within several financial tables of this report, this company is compared against the Private Passenger Auto & Homeowners Composite.

### BUSINESS REVIEW
For a detailed discussion of business review, refer to the report of Allstate Insurance Group.

### 2006 BUSINESS PRODUCTION AND PROFITABILITY ($000)

| | Premiums Written | | % of Total NPW | Pure Loss Ratio | Loss & LAE Res. |
|---|---|---|---|---|---|
| Product Line | Direct | Net | | | |
| Priv Pass Auto Liab | 4,569,948 | 9,703,412 | 38.6 | 52.9 | 8,778,168 |
| Auto Physical | 3,566,108 | 7,710,571 | 30.6 | 45.5 | 285,748 |
| Homeowners | 3,400,337 | 6,206,003 | 24.7 | 41.4 | 2,087,043 |
| Com'l MultiPeril | 547,370 | 607,069 | 2.4 | 41.5 | 396,835 |
| Allied Lines | 265,027 | 64,063 | 0.3 | 27.7 | 12,185 |
| All Other | 505,866 | 876,371 | 3.5 | 51.0 | 2,780,387 |
| Totals | 12,854,656 | 25,167,488 | 100.0 | 47.4 | 14,340,366 |

**Major 2006 Direct Premium Writings by State ($000):** New York, $2,078,252 (16.2%); California, $1,542,143 (12.0%); Florida, $1,002,769 (7.8%); Pennsylvania, $837,918 (6.5%); Illinois, $571,440 (4.4%); 46 other jurisdictions, $6,822,134 (53.1%).

### CAPITALIZATION
For a detailed discussion of capitalization, refer to the report of Allstate Insurance Group.

### CAPITAL GENERATION ANALYSIS ($000)

| | | Source of Surplus Growth | | | | |
|---|---|---|---|---|---|---|
| Period Ending | Pretax Operating Income | Total Inv. Gains | Net Contrib. Capital | Other, Net of Tax | Change in PHS | PHS Growth (%) |
| 2002 | 1,811,232 | -602,991 | -509,703 | -710,722 | -12,184 | -0.1 |
| 2003 | 2,830,197 | 1,408,011 | -1,245,979 | -652,189 | 2,340,041 | 17.0 |
| 2004 | 4,788,242 | 44,032 | -2,438,554 | -1,727,602 | 666,138 | 4.1 |
| 2005 | 1,554,232 | 174,739 | -3,801,383 | 139,351 | -1,933,062 | -11.5 |
| 2006 | 6,635,635 | 224,575 | -958,380 | -1,606,330 | 4,295,500 | 29.0 |
| 5-Yr | 17,619,537 | 1,248,386 | -8,953,999 | -4,557,492 | 5,356,433 | ... |

### HISTORY
This company was incorporated February 9, 1931 under the laws of Illinois and began business April 17 of the same year.

Capital paid up is $4,200,000, consisting of 42,000 shares of capital stock at a par value of $100 per share. All authorized shares are outstanding.

### MANAGEMENT
The company is wholly owned by The Allstate Corporation, a publicly traded holding company.

Officers: Chairman of the Board, President and Chief Executive Officer, Thomas J. Wilson; Senior Vice President and Chief Financial Officer, Danny L. Hale; Senior Vice President and Chief Investment Officer, Eric A. Simonson; Senior Vice President and Chief Information Officer, Catherine S. Brune; Senior Vice President and Chief Marketing Officer, Joseph V. Tripodi; Senior Vice President and General Counsel, Michael J. McCabe; Senior Vice Presidents, Frederick F. Cripe, Joan M. Crockett, James E. Hohmann (President and CEO Allstate Financial), Ronald D. McNeil, Michael J. Roche, George E. Ruebenson (President Allstate Protection), Casey J. Sylla, Joan H. Walker; Group Vice President and Controller, Samuel H. Pilch; Group Vice

To view a company's complete BEST'S COMPANY REPORT, refer to BEST'S INSURANCE REPORTS on CD-ROM, or go online at www.ambest.com/blr

179

# ALLSTATE INSURANCE GROUP

President, Charles N. Paul; Vice President and Secretary, Mary J. McGinn; Treasurer, Steven C. Verney.

Directors: Catherine S. Brune, Frederick F. Cripe, Joan M. Crockett, Danny L. Hale, James E. Hohmann, Michael J. McCabe, Ronald D. McNeil, Michael J. Roche, Eric A. Simonson, Casey J. Sylla, Joseph V. Tripodi, Joan H. Walker; Thomas J. Wilson.

## REGULATORY

An examination of the financial condition was made as of December 31, 2003 by the Insurance Departments of Delaware, Illinois and Mississippi. The 2006 annual independent audit of the company was conducted by Deloitte & Touche, LLP. The annual statement of actuarial opinion is provided by Aaron Halpert, KPMG, LLP.

Territory: The company is licensed in the District of Columbia, Puerto Rico, AL, AK, AZ, AR, CA, CO, CT, DE, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI and WY. It is also licensed in all Canadian provinces and territories.

## REINSURANCE PROGRAMS

For a detailed discussion of reinsurance, refer to the report of Allstate Insurance Group.

## BALANCE SHEET

### ADMITTED ASSETS ($000)

| | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| Bonds | 27,642,553 | 27,278,785 | 58.0 | 60.3 |
| Preferred stock | 376,525 | 309,293 | 0.8 | 0.7 |
| Common stock | 5,505,315 | 4,546,957 | 11.5 | 10.0 |
| Cash & short-term invest | 59,506 | -371,238 | 0.1 | -0.8 |
| Other non-affil inv asset | 2,107,203 | 1,195,242 | 4.4 | 2.6 |
| Investments in affiliates | 5,206,143 | 5,520,167 | 10.9 | 12.2 |
| Real estate, offices | 299,132 | 279,007 | 0.6 | 0.6 |
| Total invested assets | 41,196,378 | 38,758,213 | 86.4 | 85.7 |
| Premium balances | 3,929,500 | 3,834,505 | 8.2 | 8.5 |
| Accrued interest | 287,880 | 367,504 | 0.6 | 0.8 |
| All other assets | 2,265,965 | 2,283,253 | 4.8 | 5.0 |
| Total assets | 47,679,723 | 45,243,475 | 100.0 | 100.0 |

### LIABILITIES & SURPLUS ($000)

| | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| Loss & LAE reserves | 14,340,366 | 16,483,163 | 30.1 | 36.4 |
| Unearned premiums | 8,870,804 | 8,771,248 | 18.6 | 19.4 |
| Conditional reserve funds | 153,593 | 109,965 | 0.3 | 0.2 |
| All other liabilities | 5,185,800 | 5,045,438 | 10.9 | 11.2 |
| Total liabilities | 28,550,563 | 30,409,815 | 59.9 | 67.2 |
| Capital & assigned surplus | 2,372,707 | 2,307,374 | 5.0 | 5.1 |
| Unassigned surplus | 16,756,453 | 12,526,286 | 35.1 | 27.7 |
| Total policyholders' surplus | 19,129,160 | 14,833,660 | 40.1 | 32.8 |
| Total liabilities & surplus | 47,679,723 | 45,243,475 | 100.0 | 100.0 |

## SUMMARY OF 2006 OPERATIONS ($000)

| Statement of Income | 12/31/06 | Funds Provided from Operations | 12/31/06 |
|---|---|---|---|
| Premiums earned | 25,066,868 | Premiums collected | 25,102,414 |
| Losses incurred | 11,883,318 | Benefit & loss related pmts | 13,573,303 |
| LAE incurred | 2,869,348 | | |
| Undrw expenses incurred | 6,449,757 | LAE & undrw expenses paid | 9,603,041 |
| Div to policyholders | 46 | Div to policyholders | 46 |
| Net underwriting income | 3,864,399 | Undrw cash flow | 1,926,024 |
| Net investment income | 2,525,689 | Investment income | 2,524,045 |
| Other income/expense | 245,547 | Other income/expense | 245,547 |
| Pre-tax oper income | 6,635,635 | Pre-tax cash operations | 4,695,616 |
| Realized capital gains | 99,140 | | |
| Income taxes incurred | 1,813,252 | Income taxes pd (recov) | 1,440,878 |
| Net income | 4,921,523 | Net oper cash flow | 3,254,737 |

◆

STOCK COMPANY

# ALLSTATE INSURANCE GROUP
3075 Sanders Road, Suite G2H, Northbrook, IL 60062-7127
Web: www.allstate.com

Tel: 847-402-5000          Fax: 847-402-9116
AMB#: 00008

## BEST'S RATING

Based on our opinion of the group's Financial Strength, it is assigned a Best's Rating of A+ (Superior). The group's Financial Size Category is Class XV. Refer to the Preface for a complete explanation of Best's Rating system and procedure.

## RATING UNIT MEMBERS

Allstate Insurance Group:                              (AMB# 00008):

| AMB# | COMPANY | RATING | |
|---|---|---|---|
| 00764 | Allstate County Mutual Ins Co | A+ | g |
| 03652 | Allstate Fire & Cas Ins Co | A+ | g |
| 02018 | Allstate Indemnity Company | A+ | g |
| 02017 | Allstate Insurance Company | A+ | g |
| 12482 | Allstate North American Ins Co | A+ | g |
| 01978 | Allstate Prop & Cas Ins Co | A+ | g |
| 10678 | Allstate Texas Lloyd's | A+ | g |
| 11559 | Deerbrook Insurance Company | A+ | g |
| 12535 | Encompass Home and Auto Ins Co | A+ | g |
| 00542 | Encompass Indemnity Company | A+ | g |
| 12536 | Encompass Independent Ins Co | A+ | g |
| 11703 | Encompass Ins Co of America | A+ | g |
| 10130 | Encompass Insurance Co of MA | A+ | g |
| 11794 | Encompass Insurance Company | A+ | g |
| 11702 | Encompass Prop & Cas Company | A+ | g |
| 03791 | Northbrook Indemnity Company | A+ | g |

## RATING RATIONALE

Rating Rationale: The rating reflects Allstate's superior financial strength, favorable operating performance and significant market presence. Partially offsetting these positive rating factors is the group's exposure to frequent and severe weather-related events. The rating outlook is based on the group's superior capitalization and A.M. Best's expectation of continued favorable earnings.

The group's superior capital position reflects management's conservative operating philosophy and correspondingly strong balance sheet. Furthermore, management's commitment to capital discipline is reflected in the modest financial leverage maintained at The Allstate Corporation, as well as the additional liquidity provided at the holding company level through available lines of credit, its Kennett Capital, Inc. investment company, access to capital markets as well as its commercial paper program. The group's operating returns compare favorably to its industry composite peers due to its solid underwriting capabilities and increasing stream of investment income from its well-diversified investment portfolio. The favorable operating performance reflects Allstate's tightened underwriting guidelines, improved risk segmentation, adequate pricing and favorable loss trends. Additionally, underwriting results reflect the favorable impact of Allstate's various expense management initiatives and its significant investment in technology. The group maintains an outstanding market presence as the second-largest personal lines writer.

Partially offsetting these positive rating attributes is Allstate's inherent exposure to natural disasters due to its expansive market presence throughout the United States. This exposure was particularly evident in recent years as net catastrophe losses totaled $5.7 billion in 2005, with an overall combined ratio impact of 21 points, and $2.5 billion in 2004, with an overall combined ratio impact of 10 points. In addition, as a result of these catastrophe losses and significant dividend payments to its parent, the group's statutory surplus declined in 2005, resulting in deterioration of risk-adjusted capitalization. Nevertheless, the group's operating results improved significantly in 2006, which enabled it to restore statutory surplus through retained earnings to a higher level than prior to the 2005 hurricane season. Furthermore, in 2005 and prior, Allstate had property catastrophe reinsurance protection only in some of the states that experienced significant losses. However, in 2006, the group executed an extensive catastrophe risk exposure reduction program, including an enhanced property catastrophe reinsurance program, non-renewals, stricter underwriting guidelines, policy transfers, increased deductibles and discontinuance of selected lines of coverage.

Best's Rating: A+                                    Outlook: Stable

### FIVE YEAR RATING HISTORY
#### Rating as of July 23, 2007: A+

| Date | Best's Rating | Date | Best's Rating |
|---|---|---|---|
| 02/06/07 | A+ | 02/12/04 | A+ |
| 11/07/05 | A+ | 06/12/03 | A+ |
| 06/10/05 | A+ | 01/17/03 | A+ |
| 06/15/04 | A+ | | |

### KEY FINANCIAL INDICATORS ($000)

| | | | Statutory Data | | | |
|---|---|---|---|---|---|---|
| Period Ending | Direct Premiums Written | Net Premiums Written | Pretax Operating Income | Net Income | Total Admitted Assets | Policy-holders' Surplus |
| 2002 | 21,909,184 | 23,342,077 | 1,864,292 | 1,403,582 | 40,922,119 | 13,850,581 |
| 2003 | 23,277,224 | 24,636,888 | 3,050,024 | 2,845,571 | 44,689,759 | 16,199,046 |
| 2004 | 25,390,824 | 25,983,894 | 3,684,671 | 3,149,043 | 47,331,499 | 16,911,597 |
| 2005 | 27,423,130 | 26,794,750 | 1,373,294 | 1,625,609 | 47,639,292 | 14,884,474 |
| 2006 | 27,879,446 | 26,705,283 | 6,728,995 | 4,991,010 | 50,037,882 | 19,241,368 |

| | Profitability | | Leverage | | | Liquidity | |
|---|---|---|---|---|---|---|---|
| Period Ending | Comb. Ratio | Inv. Yield (%) | Pretax ROR (%) | NA Inv Lev | NPW to PHS | Net Lev. | Overall Liq. (%) | Oper. Cash-flow (%) |
| 2002 | 99.8 | 5.1 | 8.2 | 34.2 | 1.7 | 3.6 | 151.5 | 108.8 |
| 2003 | 95.2 | 5.0 | 12.7 | 38.6 | 1.5 | 3.3 | 157.3 | 116.4 |
| 2004 | 94.1 | 5.3 | 14.5 | 42.0 | 1.5 | 3.3 | 156.5 | 115.5 |
| 2005 | 103.5 | 5.5 | 5.2 | 52.1 | 1.8 | 4.0 | 146.0 | 110.0 |
| 2006 | 85.1 | 6.2 | 25.3 | 50.4 | 1.4 | 3.0 | 163.3 | 112.4 |
| 5-Yr | 95.4 | 5.4 | 13.3 | ... | ... | ... | ... | ... |

(*) Data reflected within all tables of this report has been compiled through the A.M. Best Consolidation of statutory filings. Within several financial tables of this report, this group is compared against the Private Passenger Auto & Homeowners Composite.

### CORPORATE OVERVIEW

Allstate Insurance Group, led by Allstate Insurance Company, is primarily engaged through its subsidiaries and affiliates in personal property and casualty and life insurance. Established in 1931 by Sears, Roebuck and Co., Allstate is the country's second largest property and casualty underwriter and ranks among the top twenty-five largest life and health insurers.

Allstate offers customers the ability to contact them through a multi-channel distribution and service model called the "The Good Hands Network". This system allows consumers to buy and obtain service for certain Allstate personal property and casualty products through Allstate agencies, the internet and call centers. The three channels are integrated, allowing customers to receive the same products, price and service regardless of their preferred method of interacting with the company. In 2000, the group implemented a new distribution system by reorganizing its agencies into the exclusive agency independent contractor program, equipping agencies with increased access to customer data as well as opening Customer Information Call Centers.

In an effort to increase premium revenue from the independent agent channel, the group acquired the personal lines business of CNA Financial Corporation in 1999, subsequently renamed Encompass Insurance. Effective October 1, 2005, the five remaining Encompass companies formerly owned by affiliates of CNA Financial Corporation were purchased by Allstate Insurance Group. All of the Encompass Companies are 90-100% reinsured within the group.

Allstate's property and casualty operations consist primarily of two principal areas of business: Allstate Protection and Discontinued Lines and Coverages. Allstate Protection includes the group's personal property and casualty business, and commercial business written through the Allstate agency distribution channel. Discontinued Lines and Coverages consists of business no longer written by Allstate, including results from emerging asbestos, pollution and other mass tort claims, other business in run-off, the historical results of the mortgage pool business and the businesses sold in 1996.

Private passenger automobile and homeowners products represent Allstate's primary business. The group maintains commanding national market shares and is second in the industry for each line. The group relatively small amount of commercial lines business, representing approximately 5% of property and casualty net writings, is sold largely to small and medium sized establishments. Allstate's personal lines strategy is to pursue accelerated growth and profitability through initiatives to become better, bigger and broader. In an effort to offer its customers increased efficiencies and value, Allstate Non-Insurance Holdings, Inc. acquired Sterling Collision Centers Inc. in 2001. The acquisition included 39 collision repair facilities in seven states with a strong management team with future expansion capabilities. Further, Allstate continues to reduce its high exposure to catastrophe losses through a number of loss mitigation, marketing, pricing and product initiatives.

Allstate Life Insurance Company and its life insurance subsidiaries and affiliates primarily market personal financial products including life insurance and annuities. Allstate Financial intends to expand its cross-selling of personal financial products through the property and casualty agency force. Personal financial products are marketed through multiple distribution channels: career agents, independent agents, brokers, financial planners, exclusive financial specialists, financial institutions and the Internet. Further, the 1999 acquisition of American Heritage Life Investment Corporation, the third largest distributor of life, disability and health insurance to employees at their workplace, as well as strategic alliances with major brokerage and mutual fund complexes, has helped broaden Allstate.

A.M. Best's rating of Allstate Insurance Group applies to the group's lead company, Allstate Insurance Company, and its wholly-owned subsidiaries, and is based on the consolidation of those companies as well as the separately rated wholly-owned subsidiaries of Allstate Floridian Insurance Group and Allstate New Jersey Insurance Group.

### BUSINESS REVIEW

Collectively, the property and casualty group led by Allstate Insurance Company writes multiple lines of personal and commercial insurance throughout the United States and Canada. The group's mix of business is split approximately 95% personal lines and 5% commercial lines. Primary lines of business are private passenger automobile and homeowners insurance, which respectively represent approximately 70% and 25% of Allstate's total book of property and casualty business. With personal automobile lines serving as an entree, agents are capable of cross-selling other products to policyholders, including homeowners insurance, commercial lines (generally to small and medium sized accounts) and personal financial products. Having multiple products for agents to sell has historically been instrumental in Allstate achieving high agent and customer retention.

### 2006 BUSINESS PRODUCTION AND PROFITABILITY ($000)

| | Premiums Written | | % of Total NPW | Pure Loss Ratio | Loss & LAE Reserves |
|---|---|---|---|---|---|
| Product Line | Direct | Net | | | |
| Priv Pass Auto Liab..... | 10,366,532 | 10,233,267 | 38.3 | 53.8 | 9,657,238 |
| Auto Physical ............. | 8,093,253 | 8,093,926 | 30.3 | 44.9 | 291,243 |
| Homeowners............... | 7,309,829 | 6,588,007 | 24.7 | 41.1 | 2,292,219 |
| Com'l MultiPeril......... | 644,364 | 617,501 | 2.3 | 41.1 | 402,743 |
| All Other..................... | 1,465,437 | 1,173,130 | 4.4 | 51.5 | 2,896,307 |
| Totals ..................... | 27,879,446 | 26,705,831 | 100.0 | 47.6 | 15,539,749 |

Major 2006 Direct Premium Writings by State ($000): California, $3,020,122 (10.8%); New York, $2,764,089 (9.9%); Texas, $2,656,374 (9.5%); Florida, $2,623,612 (9.4%); Pennsylvania, $1,436,842 (5.2%); 47 other jurisdictions, $15,378,377 (55.2%).

### CAPITALIZATION

**Capital Generation:** The group's surplus growth has fluctuated over the previous five year period due to the combination of underwriting losses, capital losses and sizeable stockholder dividend payments to its parent, The Allstate Corporation. The group experienced significant surplus growth in 2006, which was driven by strong underwriting earnings, increased investment income and modest capital gains that were partially offset by stockholder dividend payments to its parent. Statutory surplus declined considerably in 2005, which was attributable to a significant underwriting deficit that resulted from extraordinary catastrophe losses, as well as substantial stockholder dividend payments. Surplus growth was modest in 2004, reflective of solid operating earnings and to a lesser extent, capital gains, which were partially offset by stockholder dividend payments. Surplus growth was strong in 2003, which was driven by solid operating earnings and significant capital gains on its equity portfolio. Surplus growth was flat in 2002, tempered by underwriting losses, lower investment income and capital losses due to unfavorable equity market conditions.

### CAPITAL GENERATION ANALYSIS ($000)

| | | | Source of Surplus Growth | | | |
|---|---|---|---|---|---|---|
| Period Ending | Pretax Operating Income | Total Inv. Gains | Net Contrib. Capital | Other, Net of Tax | Change in PHS | PHS Growth (%) |
| 2002 | 1,864,292 | -592,403 | -475,141 | -782,457 | 14,292 | 0.1 |
| 2003 | 3,050,024 | 1,271,127 | -1,229,984 | -742,703 | 2,348,464 | 17.0 |
| 2004 | 3,684,671 | 795,113 | -2,388,251 | -1,378,981 | 712,551 | 4.4 |
| 2005 | 1,373,294 | 335,011 | -3,897,270 | 161,842 | -2,027,123 | -12.0 |
| 2006 | 6,728,995 | 305,191 | -1,004,665 | -1,672,627 | 4,356,894 | 29.3 |
| 5-Yr | 16,701,275 | 2,114,039 | -8,995,310 | -4,414,926 | 5,405,078 | ... |

**Overall Capitalization:** Allstate maintains superior overall capitalization as measured by Best's Capital Adequacy Ratio (BCAR), which supports its rating. The group's capital position is reflective of its high quality and well diversified investment portfolio, conservative operating strategies and favorable loss reserve development on its core lines of business. Partially offsetting these positive factors are Allstate's modestly above average

*To view a company's complete BEST'S COMPANY REPORT, refer to BEST'S INSURANCE REPORTS on CD-ROM, or go online at www.ambest.com/bir*

**ALLSTATE INSURANCE GROUP**

underwriting leverage, exposure to both frequent and severe catastrophe losses, as well as the amount of pyramided capital relating to unconsolidated subsidiaries, a major portion of which relates to its ownership of Allstate Life Insurance Company. Allstate, maintains additional financial flexibility through available lines of credit, access to capital markets and its commercial paper program. The holding company also maintains a substantial amount of liquid assets in Kennett Capital, Inc., which can be utilized to fund its debt and shareholder dividend requirements. Furthermore, these funds provide a source of capital, which can be contributed to the insurance group to support its growth and capital objectives. The Allstate Corporation's debt to total capital ratio is within acceptable levels for the rating and is well supported by historically strong fixed charge coverage. Management is further improving its financial-leverage position through risk management initiatives that have mitigated some of its loss exposure to catastrophe losses.

## QUALITY OF SURPLUS ($000)

| Period Ending | Year-End PHS | Cap. Stock/ Contrib. Cap. | % of PHS Other | Unassigned Surplus | Stock-holder Divs. | Dividend Requirements Div. To POI (%) | Div.To Net Inc. (%) |
|---|---|---|---|---|---|---|---|
| 2002 | 13,850,581 | 16.0 | 0.5 | 83.5 | -615,000 | 36.2 | 48.1 |
| 2003 | 16,199,046 | 14.0 | 0.4 | 85.7 | -1,273,213 | 41.7 | 44.7 |
| 2004 | 16,911,597 | 13.7 | 0.5 | 85.8 | -2,486,430 | 67.5 | 79.0 |
| 2005 | 14,884,474 | 15.8 | 0.2 | 84.0 | -3,893,500 | 283.5 | 239.5 |
| 2006 | 19,241,368 | 12.8 | 0.2 | 87.0 | -1,011,000 | 15.0 | 20.3 |

**Underwriting Leverage:** Allstate maintains modestly above average gross and net underwriting leverage relative to the private passenger auto and homeowners industry composite. The group's underwriting leverage is driven by slightly above average net premiums written, net liabilities and ceded reinsurance leverage.

The group has generated modest growth in net premiums written over the previous five year period, which was attributable to rate increases in conjunction with overall firm rates in the property and casualty market. Net premiums written growth has flattened in recent years due to increasingly competitive priced-based competition and the group's initiatives to reduce catastrophe exposure.

## LEVERAGE ANALYSIS

| Period Ending | NPW to PHS | Company Res. to PHS | Net Lev. | Gross Lev. | NPW to PHS | Industry Composite Res. to PHS | Net Lev. | Gross Lev. |
|---|---|---|---|---|---|---|---|---|
| 2002 | 1.7 | 1.0 | 3.6 | 3.8 | 1.5 | 0.9 | 3.4 | 3.6 |
| 2003 | 1.5 | 0.9 | 3.3 | 3.4 | 1.4 | 0.8 | 3.1 | 3.3 |
| 2004 | 1.5 | 0.9 | 3.3 | 3.6 | 1.3 | 0.8 | 2.9 | 3.1 |
| 2005 | 1.8 | 1.2 | 4.0 | 4.3 | 1.2 | 0.8 | 2.8 | 3.0 |
| 2006 | 1.4 | 0.8 | 3.0 | 3.2 | 1.1 | 0.6 | 2.4 | 2.6 |

Current BCAR: 229.6

## PREMIUM COMPOSITION & GROWTH ANALYSIS

| Period Ending | DPW ($000) | (% Chg) | GPW ($000) | (% Chg) | NPW ($000) | (% Chg) | NPE ($000) | (% Chg) |
|---|---|---|---|---|---|---|---|---|
| 2002 | 21,909,184 | 6.7 | 23,729,351 | 6.4 | 23,342,077 | 6.1 | 22,780,075 | 5.3 |
| 2003 | 23,277,224 | 6.2 | 25,131,357 | 5.9 | 24,636,888 | 5.5 | 24,083,364 | 5.7 |
| 2004 | 25,390,824 | 9.1 | 27,105,786 | 7.9 | 25,983,894 | 5.5 | 25,388,450 | 5.4 |
| 2005 | 27,423,130 | 8.0 | 28,297,188 | 4.4 | 26,794,750 | 3.1 | 26,451,249 | 4.2 |
| 2006 | 27,879,416 | 1.7 | 27,922,824 | -1.3 | 26,705,831 | -0.3 | 26,634,034 | 0.7 |
| 5-Yr CAGR | ... | 6.3 | ... | 4.6 | ... | 4.0 | ... | 4.3 |
| 5-Yr Chg | ... | 35.8 | ... | 25.1 | ... | 21.4 | ... | 23.2 |

**Reserve Quality:** The group's loss reserve development has historically been unfavorable on a calendar year basis. The adverse development was driven by additions to reserves in the Discontinued Lines and Coverages Segment, primarily for asbestos and environmental liabilities, which offset the favorable loss reserve development reported by Allstate's personal lines business. However, recent calendar and accident year development has been modestly favorable. The majority (approximately 60%) of total reserves are associated with the private passenger auto liability, with homeowners accounting for approximately 15% of total reserves.

The group segregates its asbestos, environmental and other mass tort reserves for business previously written by its former Northbrook subsidiaries and for reinsurance assumed in its Discontinued Lines and Coverages operations. According to A.M. Best's estimates, Allstate ranks among the top 30 insurers in the nation with an approximate 4% historic market share in commercial lines that are exposed to ongoing asbestos and environmental (A&E) claims emergence. Based on footnote 33 disclosure data, Allstate reported $2.4 billion and $1.6 billion of gross and net A&E reserves, respectively, for year-end 2006. Net reserves were split 88% asbestos and 12% pollution reserves. Given its significant personal lines orientation, Allstate's net A&E reserves constitute only 10% of its overall loss reserve base. All of Allstate's potential A&E liability exposure stems from both direct and assumed excess coverages written by discontinued operations. The group's

---

strategy has been to pursue economically viable direct policy buy-backs and commutations.

## LOSS & ALAE RESERVE DEVELOP.: CALENDAR YEAR ($000)

| Calendar Year | Orig. Loss Reserves | Developed Reserves Thru '06 | Develop. to Orig. (%) | Develop. to PHS (%) | Develop. to NPE (%) | Unpaid Reserves @12/06 | Unpaid Res. to Develop. (%) |
|---|---|---|---|---|---|---|---|
| 2001 | 12,954,392 | 14,989,094 | 15.7 | 14.7 | 69.3 | -2,853,502 | 19.0 |
| 2002 | 13,213,799 | 14,100,749 | 6.7 | 6.4 | 61.9 | 3,288,687 | 23.3 |
| 2003 | 14,026,364 | 13,710,637 | -2.3 | -1.9 | 56.9 | 4,101,581 | 29.9 |
| 2004 | 14,631,052 | 13,767,314 | -5.9 | -5.1 | 54.2 | 5,607,479 | 40.7 |
| 2005 | 16,270,623 | 15,367,145 | -5.6 | -6.1 | 58.1 | 8,800,446 | 57.3 |
| 2006 | 14,280,756 | 14,280,756 | ... | ... | 53.6 | 14,280,756 | 100.0 |

## ASBESTOS & ENVIRONMENTAL (A&E) RESERVE ANALYSIS

| Year | Net A&E Reserve ($000) | Company Reten-tion (%) | Net IBNR Mix (%) | Survival Ratio (3 yr) | Comb Ratio Impact (1 yr) | Comb Ratio Impact (3 yr) | Industry Composite Survival Ratio (3 yr) | Comb Ratio Impact (1 yr) | Comb Ratio Impact (3 yr) |
|---|---|---|---|---|---|---|---|---|---|
| 2002 | 933,411 | 72.4 | 53.7 | ... | 0.6 | ... | ... | 2.3 | ... |
| 2003 | 1,329,575 | 70.3 | 59.9 | ... | 2.2 | ... | ... | 1.7 | ... |
| 2004 | 1,689,093 | 62.5 | 61.6 | 11.2 | 1.8 | 1.6 | 8.3 | 1.4 | 1.8 |
| 2005 | 1,568,381 | 64.1 | 67.8 | 9.7 | 0.5 | 1.5 | 8.4 | 1.0 | 1.4 |
| 2006 | 1,558,606 | 64.0 | 66.4 | 10.0 | 0.4 | 0.9 | 7.9 | 0.5 | 0.9 |

**Reinsurance Utilization:** Historically, Allstate's utilization of external reinsurance was very limited, as evidenced by the group's high business retention. Due to Allstate's significant personal lines market share and property base, management had for many years considered it impractical for the group to purchase catastrophe reinsurance protection. However, beginning in 2004, Allstate Insurance Company and select other affiliates entered into a catastrophe excess of loss reinsurance contract with external parties. In recent years, the company has executed an extensive array of catastrophe risk reduction reinsurance arrangements. The group's reinsurance activity also includes inter-company arrangements with affiliates, as well as mandated state assigned pools and facilities. The group maintains excess of loss coverage on its commercial umbrella and commercial property programs. Furthermore, Allstate's dedicated Florida-only property insurers maintain reinsurance protection available from the Florida Hurricane, Catastrophe Fund. In addition, the group is a participating member in the California Earthquake Authority.

As a countrywide homeowners writer, the group is susceptible to aggregate losses from earthquakes and hurricanes. However, the group's pre-tax net catastrophe leverage for a 250-year earthquake or a 100-year hurricane, as depicted in a probable maximum loss analysis, is manageable at less than 15% of surplus. Adjusted for this exposure, Allstate's capitalization remains comfortably supportive of its rating. In addition to the purchase of catastrophe reinsurance, the group has undertaken numerous risk management strategies in recent years to mitigate its catastrophe loss exposure for its homeowners, condominium, mobile home and landlord package policies. These included replacement carrier transactions with third parties not affiliated with Allstate, non-renewals of existing business, discontinuation of new business writings, rate increases and higher catastrophe deductibles in locations with significant hurricane or earthquake loss exposure.

## CEDED REINSURANCE ANALYSIS ($000)

| Period Ending | Company Ceded Reins. Total | Bus. Ret. (%) | Reins. Recov. to PHS (%) | Ceded Reins. to PHS (%) | Industry Composite Bus. Ret. (%) | Reins. Recov. to PHS (%) | Ceded Reins. to PHS (%) |
|---|---|---|---|---|---|---|---|
| 2002 | 1,951,297 | 98.4 | 11.4 | 14.1 | 94.1 | 14.5 | 23.7 |
| 2003 | 2,378,519 | 98.0 | 11.6 | 14.7 | 94.1 | 14.6 | 22.9 |
| 2004 | 4,630,377 | 95.9 | 20.7 | 27.4 | 94.4 | 14.5 | 22.1 |
| 2005 | 4,519,329 | 94.7 | 26.0 | 30.4 | 94.6 | 16.4 | 22.7 |
| 2006 | 3,985,231 | 95.6 | 14.4 | 20.7 | 94.9 | 11.9 | 17.6 |

## 2006 REINSURANCE RECOVERABLES ($000)

| | Paid & Unpaid Losses | IBNR | Unearned Premiums | Other Recov* | Total Reins Recov |
|---|---|---|---|---|---|
| US Affiliates | 3,590,488 | 1,050,908 | 4,780,056 | ... | 9,421,452 |
| US Insurers | 252,122 | 272,973 | -66,023 | -801 | 590,317 |
| Pools/Associations | 1,235,072 | 97,050 | 151,163 | -797 | 1,482,488 |
| Other Non-US | 209,733 | 413,850 | 87,229 | -15,327 | 695,485 |
| Total (ex US Affil) | 1,696,927 | 783,873 | 304,415 | -16,925 | 2,768,290 |
| Grand Total | 5,287,415 | 1,834,781 | 5,084,472 | -16,925 | 12,189,742 |

* Includes Commissions less Funds Withheld

**Investment Leverage:** Allstate's investment leverage approximates the private passenger auto and homeowners industry composite. The group's investment leverage is derived from slightly below average non-affiliated investment leverage, which is offset by slightly above average affiliated investment leverage. The affiliated investments are primarily related to Allstate Life Insurance Company. The group's non-affiliated investment

leverage is primarily driven by unaffiliated common stock, which equates to approximately 30% of surplus, and non-investment grade bonds, which equate to approximately 10% of surplus. Although the group's holdings of non-investment grade bonds is greater than industry composite norms, it is not considered excessive, as a portion is related to private placement and municipal securities that are not NAIC rated. Overall, Allstate's investment portfolio is well diversified, consisting predominantly of high quality fixed-income securities and equity holdings devoted primarily to large capitalization stocks.

### INVESTMENT LEVERAGE ANALYSIS (% OF PHS)

| | | | Company | | | | Industry Composite | |
|---|---|---|---|---|---|---|---|---|
| Period Ending | Class 3-6 Bonds | Real Estate/ Mtg. | Other Invested Assets | Common Stocks | Non-Affil. Inv. Lev. | Affil. Inv. | Class 3-6 Bonds | Common Stocks |
| 2002 | 9.2 | 0.5 | 4.6 | 19.9 | 34.2 | 27.1 | 4.9 | 47.0 |
| 2003 | 8.9 | 0.4 | 2.9 | 26.4 | 38.6 | 26.1 | 4.1 | 48.7 |
| 2004 | 8.6 | 2.3 | 3.2 | 27.9 | 42.0 | 26.1 | 3.1 | 46.0 |
| 2005 | 12.0 | 3.4 | 4.7 | 32.0 | 52.1 | 29.7 | 3.3 | 44.3 |
| 2006 | 9.5 | 3.4 | 7.7 | 29.8 | 50.4 | 21.1 | 2.7 | 44.7 |

### HISTORY

Allstate Insurance Company, the lead company of the Allstate Insurance Group, was incorporated on February 9, 1931 and began business on April 17, 1931. Charter powers permitted the company to write all forms of casualty coverages but writings were originally limited to automobile insurance. The company has grown to be the largest writer of automobile insurance coverages of any capital stock company, a position enjoyed for many years. Expanding rapidly, Allstate Insurance Company, by the late 1950s, was offering commercial fire, personal theft and homeowners. In the 1960s, the company added workers' compensation, surety bonds, boiler and machinery, ocean marine, business umbrella coverage, business package policies and reinsurance.

Allstate was controlled by and consolidated with Sears, Roebuck and Co. until late June 1995 at which time Sears spun off its 80% ownership interest in The Allstate Corporation to its common stockholders. In June 1993, The Allstate Corporation sold 89.5 million shares of its common stock, which represented 20% ownership, to the public through an IPO with $1.25 billion of the proceeds invested in the property and casualty insurance operations. The offering had the favorable impact of replenishing Allstate's then somewhat depleted surplus base, following the significant catastrophe losses it sustained in 1992, and enhanced its financial flexibility with direct access to the capital markets through its holding company.

Other members of the Allstate Insurance Group include Allstate Indemnity Company (organized in 1960); Allstate Insurance Company of Canada (incorporated in 1960); Allstate Life Insurance Company of Canada (incorporated in 1963); Allstate Property and Casualty Insurance Company (organized in 1985); Allstate Fire and Casualty Insurance Company (formerly Forestview Mortgage Insurance Company, acquired in 1973); and Allstate North American Insurance Company (organized in 2001). In 1996 and 1997, Allstate Floridian Insurance Company and Allstate Floridian Indemnity Company, respectively, were formed as the group's dedicated, Florida-only property affiliates. Encompass Floridian Insurance Company and Encompass Floridian Indemnity Company were formed in 2004. Allstate New Jersey Insurance Company was formed in 1997 and Encompass Insurance Company of New Jersey was formed in 2003. Two wholly owned subsidiaries of Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Encompass Property Casualty Insurance Company of New Jersey were formed in 2005. Also having a community of interest within the Allstate Insurance Group are Allstate County Mutual Insurance Company and Allstate Texas Lloyd's, both of Irving, Texas.

Over the past few years Allstate has sold many of its non-core operations, in order to focus more on its core strengths of personal property and casualty and life insurance in North America. In 1997, Allstate International, Inc. completed the sale of its interest in two Japanese joint ventures. Also in 1997, Allstate sold all of the stock of Barrington Reinsurance Company, Ltd. In the second half of 1996, Allstate Insurance Company sold Northbrook Holdings, Inc. and its three wholly owned subsidiaries, which wrote commercial property and casualty insurance through independent agents; its U.S. based property and casualty reinsurance operations for policies written after 1984; and London-based property and casualty reinsurance operations. In 2001, Allstate exited International operations with the sale of its Southeast Asian life insurance operations and its sale of its European automobile insurance operations.

In 2001, the company formed the Ivantage Group of independent agency companies comprised of Northbrook Indemnity Company (acquired in 2000); Deerbrook Insurance Company (formerly Allstate National Insurance Company, formed in 1979); Encompass Indemnity Company (formerly American Surety & Casualty Company, acquired in 1998); and Encompass Insurance Company (formerly USF&G Business Insurance Company, acquired in 2001). Use of the Ivantage name for marketing purposes was discontinued in 2004. In 2005, Encompass Home and Auto Insurance

Company, Encompass Independent Insurance Company, Encompass Insurance Company of America, Encompass Insurance Company of Massachusetts and Encompass Property & Casualty Insurance Company became wholly owned subsidiaries of Encompass Financial Group, LLC, which is wholly owned by Allstate Insurance Company.

Allstate Insurance Company also owns Allstate Life Insurance Company (chartered in 1957), the lead life insurance company of the Allstate Financial Group, which also includes Allstate Life Insurance Company of New York (formerly PM Life Insurance Company, acquired in 1983); American Heritage Life Insurance Company (acquired in 1999); Charter National Life Insurance Company (acquired in 1999); Glenbrook Life and Annuity Company (formerly William Penn Life Assurance Company of America, acquired in 1992); Intramerica Life Insurance Company (acquired in 1999); Lincoln Benefit Life Company (acquired in 1981); Allstate Assurance Company (formerly Provident National Assurance Company, acquired in 2001); and Surety Life Insurance Company (acquired in 1981). In 2006, Allstate Life sold its Variable Annuity business through a reinsurance transaction with Prudential Insurance Company of America.

### MANAGEMENT

In late June 1995, Sears, Roebuck and Co. spun off its remaining 80.3% ownership interest in The Allstate Corporation to its common stockholders.

The group is headed by Edward M. Liddy, chairman of the board, and Thomas J. Wilson, president and chief executive officer, who assumed these positions on January 1, 1999 and January 1, 2007, respectively. The Allstate Corporation is a publicly traded holding company and trades on the New York Stock Exchange under the symbol ALL.

### REGULATORY

**Territory:** The individual member companies of the group collectively operate in DC, Puerto Rico and all states except Massachusetts. In addition, operations are also conducted in all provinces of Canada.

### REINSURANCE PROGRAMS

During the past several years, personal lines exposures have declined due to aggressive catastrophe management initiatives that include adequate rate per risk, increased use of deductibles, efficient utilization of state catastrophe pools, risk transfers including targeted reinsurance programs and enhanced underwriting using relative PML risk by geographic area. Multi-year individual state reinsurance treaties cover personal property excess catastrophe losses in Connecticut, New Jersey, New York, and Texas through May 31, 2008 and Florida through May 31, 2007. In 2006, additional reinsurance protection was acquired by purchasing supplementary reinsurance in Florida, a New Jersey excess agreement, an aggregate excess reinsurance program, a California fire following program and a South-East program. The additional reinsurance in Florida coordinates coverage with the Florida Hurricane Catastrophe Fund and multi-year agreement. The Florida agreements cover Allstate Protection's personal property catastrophe losses and expire May 31, 2007. A reinsurance program is being negotiated to replace this program effective June 1, 2007. The New Jersey excess agreement is effective June 1, 2006, for one year, and covers Allstate Protection's personal property catastrophe losses in excess of the multi-year agreement. Reinsurance has been purchased to replace this program effective June 1, 2007. The aggregate excess reinsurance program limits Allstate Protection's personal lines property and auto catastrophe losses for storms named or numbered by the National Weather Service, earthquakes, and fires following earthquakes in excess of $2 billion in aggregated losses up to the treaty limit of $2 billion, excluding Florida. Reinsurance has been purchased offering similar coverage effective June 1, 2007, the majority of which provides 2 years of coverage. The California fire following program is effective through May 31, 2008 and covers Allstate Protection's personal property excess catastrophe losses in California for fires following earthquakes. This agreement provides $1.5 billion of coverage for all qualifying losses in excess of a $500 million retention. The South-East agreement was effective June 1, 2006 for one year and provides 80% of $500 million in additional reinsurance protection, excess of a $500 million retention, for Allstate Protection's personal property losses for storms named or numbered by the National Weather Service in the states of Louisiana, Mississippi, Alabama, Georgia, South Carolina, North Carolina, Virginia, Maryland, Delaware, Pennsylvania and the District of Columbia. Effective June 1, 2007 the South East Agreement is expanded to provide 95% of the $500m limit and to provide coverage for Rhode Island in addition to the state previously covered. Further, the formation of dedicated Florida-only property and New Jersey-only affiliates and participation in the Florida Hurricane Catastrophe Fund and California Earthquake Authority have contributed to the reduction in the group's countrywide exposures. The company purchased new reinsurance covering earthquakes and fire following earthquakes in Kentucky effective June 1, 2007.

The group's commercial property business is protected by per risk excess of loss agreements that cover limits of $26 million excess of $4 million net retention. For limits above this level, the company purchases individual property facultative reinsurance. For umbrella policies, the company retains the first $5 million and purchases individual umbrella facultative reinsurance for limits above $5 million.

*To view a company's complete BEST'S COMPANY REPORT, refer to BEST'S INSURANCE REPORTS on CD-ROM, or go online at www.ambest.com/bir*

## CONSOLIDATED BALANCE SHEET
### (at December 31, 2006)
#### ADMITTED ASSETS ($000)

| | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| Bonds | 30,555,794 | 30,136,174 | 61.1 | 63.3 |
| Preferred stock | 377,508 | 309,293 | 0.8 | 0.6 |
| Common stock | 5,738,056 | 4,759,249 | 11.5 | 10.0 |
| Cash & short-term invest | 149,013 | -287,680 | 0.3 | -0.6 |
| Other non-affil inv asset | 2,124,075 | 1,208,493 | 4.2 | 2.5 |
| Investments in affiliates | 3,759,900 | 4,142,596 | 7.5 | 8.7 |
| Real estate, offices | 299,132 | 279,007 | 0.6 | 0.6 |
| Total invested assets | 43,003,477 | 40,547,131 | 85.9 | 85.1 |
| Premium balances | 4,246,843 | 4,161,069 | 8.5 | 8.7 |
| Accrued interest | 324,188 | 363,850 | 0.6 | 0.8 |
| All other assets | 2,463,373 | 2,567,243 | 4.9 | 5.4 |
| Total assets | 50,037,882 | 47,639,292 | 100.0 | 100.0 |

#### LIABILITIES & SURPLUS ($000)

| | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| Loss & LAE reserve | 15,539,749 | 17,813,086 | 31.1 | 37.4 |
| Unearned premiums | 9,681,493 | 9,610,760 | 19.3 | 20.2 |
| Conditional reserve funds | 159,481 | 115,343 | 0.3 | 0.2 |
| All other liabilities | 5,415,791 | 5,215,629 | 10.8 | 10.9 |
| Total liabilities | 30,796,514 | 32,754,819 | 61.5 | 68.8 |
| Total policyholders' surplus | 19,241,368 | 14,884,474 | 38.5 | 31.2 |
| Total liabilities & surplus | 50,037,882 | 47,639,292 | 100.0 | 100.0 |

## CONSOLIDATED SUMMARY OF 2006 OPERATIONS ($000)

| Statement of Income | 12/31/06 | Funds Provided from Operations | 12/31/06 |
|---|---|---|---|
| Premiums earned | 26,634,034 | Premiums collected | 26,661,036 |
| Losses incurred | 12,679,921 | Benefit & loss related pmts | 14,465,665 |
| LAE incurred | 3,113,668 | | |
| Undrw expenses incurred | 6,877,906 | LAE & undrw expenses paid | 10,298,983 |
| Div to policyholders | 46 | Div to policyholders | 46 |
| Net underwriting income | 3,962,493 | Undrw cash flow | 1,896,343 |
| Net investment income | 2,509,828 | Investment income | 2,481,881 |
| Other income/expense | 256,673 | Other income/expense | 257,662 |
| Pre-tax oper income | 6,728,995 | Pre-tax cash operations | 4,635,886 |
| Realized capital gains | 119,176 | | |
| Income taxes incurred | 1,857,160 | Income taxes pd (recov) | 1,396,139 |
| Net income | 4,991,010 | Net oper cash flow | 3,239,748 |

◆

## Allstate Insurance Group

### Ultimate Parent: Allstate Corporation
### ALLSTATE NEW JERSEY INSURANCE COMPANY
Northbrook, IL
721 U.S. Highway 202-206, Suite 300, Bridgewater, NJ 08807-1759
Web: www.allstate.com

| | |
|---|---|
| Tel: 847-402-5000 | Fax: 847-402-9116 |
| AMB#: 12106 | NAIC#: 10852 |
| Ultimate Parent#: 58312 | FEIN#: 36-4181960 |

### BEST'S RATING

Based on our opinion of the consolidated Financial Strength of the property/casualty members of Allstate New Jersey Insurance Group, which operate under a group structure, each group member is assigned a Best's Rating of A- (Excellent). The company is assigned the Financial Size Category of Class XI, which is the Financial Size Category of the group. Refer to the Preface for a complete explanation of Best's Rating system and procedure.

### RATING RATIONALE

For a detailed discussion of the rating rationale, refer to the report of Allstate New Jersey Insurance Group.

**Best's Rating: A- g**      **Outlook: Stable**

---

## FIVE-YEAR RATING HISTORY
### Rating as of July 23, 2007: A- g

| Date | Best's Rating | Date | Best's Rating |
|---|---|---|---|
| 02/06/07 | A- g | 03/15/04 | A- g |
| 06/20/06 | A- g | 06/12/03 | A- |
| 06/10/05 | A- g | 01/17/03 | A- |

## KEY FINANCIAL INDICATORS ($000)

| | | | Statutory Data | | | |
|---|---|---|---|---|---|---|
| Period Ending | Direct Premiums Written | Net Premiums Written | Pretax Operating Income | Net Income | Total Admitted Assets | Policy-holders' Surplus |
| 2002 | 847,610 | 1,008,163 | 161,032 | 97,935 | 1,897,896 | 567,094 |
| 2003 | 968,845 | 991,772 | 150,977 | 126,247 | 1,844,214 | 691,495 |
| 2004 | 1,058,377 | 1,271,240 | 217,801 | 149,602 | 2,316,889 | 728,000 |
| 2005 | 1,013,642 | 1,213,317 | 233,645 | 181,033 | 2,372,865 | 747,069 |
| 2006 | 982,454 | 1,169,370 | 188,382 | 159,661 | 2,398,398 | 779,381 |

| | Profitability | | | Leverage | | | Liquidity | |
|---|---|---|---|---|---|---|---|---|
| Period Ending | Comb. Ratio | Inv. Yield (%) | Pretax ROR (%) | NA Inv Lev | NPW to PHS | Net Lev. | Overall Liq. (%) | Oper. Cash-flow (%) |
| 2002 | 91.4 | 4.8 | 16.5 | 19.8 | 1.8 | 4.1 | 142.6 | 135.5 |
| 2003 | 94.9 | 4.7 | 14.4 | 29.1 | 1.4 | 3.1 | 160.0 | 98.0 |
| 2004 | 86.9 | 4.7 | 19.2 | 29.0 | 1.7 | 3.9 | 145.8 | 159.4 |
| 2005 | 89.0 | 4.4 | 19.1 | 28.1 | 1.6 | 3.8 | 146.0 | 116.8 |
| 2006 | 92.6 | 4.4 | 16.0 | 30.9 | 1.5 | 3.6 | 148.1 | 114.5 |
| 5-Yr | 90.8 | 4.6 | 17.1 | ... | ... | ... | ... | ... |

(*) Data reflected within all tables of this report has been compiled from the company-filed statutory statement. Within several financial tables of this report, this company is compared against the Private Passenger Auto & Homeowners Composite.

### BUSINESS REVIEW

For a detailed discussion of business review, refer to the report of Allstate New Jersey Insurance Group.

### 2006 BUSINESS PRODUCTION AND PROFITABILITY ($000)

| | Premiums Written | | % of Total NPW | Pure Loss Ratio | Loss & LAE Ret. |
|---|---|---|---|---|---|
| Product Line | Direct | Net | | | |
| Priv Pass Auto Liab | 435,665 | 519,188 | 44.4 | 69.6 | 876,648 |
| Auto Physical | 311,309 | 375,614 | 32.1 | 33.5 | 4,996 |
| Homeowners | 171,618 | 206,698 | 17.7 | 44.1 | 152,551 |
| Comm'l Auto Liab | 34,802 | 35,754 | 3.1 | 57.9 | 48,789 |
| All Other | 29,060 | 32,115 | 2.7 | 40.1 | 14,914 |
| Totals | 982,454 | 1,169,370 | 100.0 | 52.4 | 1,097,897 |

Major 2006 Direct Premium Writings by State ($000): New Jersey, $982,454 (100.0%).

### CAPITALIZATION

For a detailed discussion of capitalization, refer to the report of Allstate New Jersey Insurance Company.

### CAPITAL GENERATION ANALYSIS ($000)

| | | | Source of Surplus Growth | | | |
|---|---|---|---|---|---|---|
| Period Ending | Pretax Operating Income | Total Inv. Gains | Net Contrib. Capital | Other, Net of Tax | Change in PHS | PHS Growth (%) |
| 2002 | 161,032 | -19,623 | -109,749 | -42,169 | -10,509 | -1.8 |
| 2003 | 150,977 | 44,364 | -37,910 | -33,030 | 124,401 | 21.9 |
| 2004 | 217,801 | 19,045 | -125,560 | -74,782 | 36,505 | 5.3 |
| 2005 | 233,645 | 8,231 | -148,868 | -73,938 | 19,069 | 2.6 |
| 2006 | 188,382 | 24,768 | -142,839 | -37,999 | 32,312 | 4.3 |
| 5-Yr | 951,836 | 76,784 | -564,927 | -261,917 | 201,777 | ... |

### HISTORY

Allstate New Jersey Insurance Company (ANJ) is an Illinois domiciled insurer licensed to write property and casualty business in the states of New Jersey and Illinois. On October 7, 1997, Allstate New Jersey Holdings, Inc. (now NJ Holdings, LLC), a wholly-owned subsidiary of Allstate Insurance Company (AIC), purchased all of the issued and outstanding common stock of ANJ. AIC is 100% owned by The Allstate Corporation. As a result, The Allstate Corporation indirectly owns 100% of ANJ's 42,000 outstanding shares. As of December 31, 1997, AIC contributed $463 million to Allstate New Jersey Holdings, Inc., which in turn contributed $463 million to ANJ.

### MANAGEMENT

Allstate Insurance Company is the sole owner of NJ Holdings, LLC, the holding company for Allstate New Jersey Insurance Company (ANJ). Personal property and commercial policies were renewed beginning on January 1, 1998. Personal auto policies were transferred beginning with

December 9, 1998 renewals. New property and commercial policies with effective dates of January 1, 1998 and subsequent were written in ANJ. Also, new personal auto policies were written in ANJ beginning on November 2, 1998. ANJ wholly owns Encompass Insurance Company of New Jersey. Allstate Insurance Company is chiefly responsible for organizing ANJ and provides several services to the company.

**Officers:** Chairman of the Board, Joe Richardson; President, William P. Ballinger; Senior Vice President and Chief Financial Officer, Danny L. Hale; Senior Vice President and Chief Investment Officer, Eric A. Simonson; Group Vice President and Controller, Samuel H. Pilch; Vice President and Treasurer, Steven C. Verney; Vice President and Secretary, William A. Vainisi; Vice President and Treasurer, Steven C. Verney; Vice President and General Counsel, William G. Crimmins; Vice Presidents, Karen C. Gardner, J. Terrence Kelaher.

**Directors:** William P. Ballinger, Michael A. LaMonica, Samuel H. Pilch, Joe Richardson, Steven E. Shebik, William A. Vainisi, Steven C. Verney, James P. Zils.

## REGULATORY

An examination of the financial condition was made as of December 31, 2003 by the Insurance Departments of Delaware, Illinois and Mississippi. The 2006 annual independent audit of the company was conducted by Deloitte & Touche, LLP. The annual statement of actuarial opinion is provided by Aaron Halpert, KPMG, LLP.

**Territory:** The company is licensed in Illinois and New Jersey.

## REINSURANCE PROGRAMS

For a detailed discussion of reinsurance, refer to the report of Allstate New Jersey Insurance Group.

## BALANCE SHEET

### ADMITTED ASSETS ($000)

|  | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| Bonds | 1,787,872 | 1,789,122 | 74.5 | 75.4 |
| Common stock | 230,236 | 204,653 | 9.6 | 8.6 |
| Cash & short-term invest | 9,967 | 10,474 | 0.4 | 0.4 |
| Other non-affil inv asset | 5,302 | 546 | 0.2 | 0.0 |
| Investments in affiliates | 45,620 | 31,195 | 1.9 | 1.3 |
| Total invested assets | 2,078,997 | 2,035,989 | 86.7 | 85.8 |
| Premium balances | 216,105 | 233,729 | 9.0 | 9.9 |
| Accrued interest | 20,612 | 20,922 | 0.9 | 0.9 |
| All other assets | 82,685 | 82,224 | 3.4 | 3.5 |
| Total assets | 2,398,398 | 2,372,865 | 100.0 | 100.0 |

### LIABILITIES & SURPLUS ($000)

|  | 12/31/06 | 12/31/05 | '06% | '05% |
|---|---|---|---|---|
| Loss & LAE reserves | 1,097,897 | 1,074,205 | 45.8 | 45.3 |
| Unearned premiums | 422,616 | 431,333 | 17.6 | 18.2 |
| All other liabilities | 98,504 | 120,259 | 4.1 | 5.1 |
| Total liabilities | 1,619,018 | 1,625,796 | 67.5 | 68.5 |
| Capital & assigned surplus | 463,872 | 463,712 | 19.3 | 19.5 |
| Unassigned surplus | 315,508 | 283,357 | 13.2 | 11.9 |
| Total policyholders' surplus | 779,381 | 747,069 | 32.5 | 31.5 |
| Total liabilities & surplus | 2,398,398 | 2,372,865 | 100.0 | 100.0 |

### SUMMARY OF 2006 OPERATIONS ($000)

| Statement of Income | 12/31/06 | Funds Provided from Operations | 12/31/06 |
|---|---|---|---|
| Premiums earned | 1,178,086 | Premiums collected | 1,175,955 |
| Losses incurred | 617,368 | Benefit & loss related pmts | 603,113 |
| LAE incurred | 201,976 | | |
| Undrw expenses incurred | 269,052 | LAE & undrw expenses paid | 468,080 |
| Net underwriting income | 89,689 | Undrw cash flow | 104,762 |
| Net investment income | 89,187 | Investment income | 92,213 |
| Other income/expense | 9,505 | Other income/expense | 9,505 |
| Pre-tax oper income | 188,382 | Pre-tax cash operations | 206,480 |
| Realized capital gains | 12,117 | | |
| Income taxes incurred | 40,898 | Income taxes pd (recov) | 44,436 |
| Net income | 159,661 | Net oper cash flow | 162,045 |

◆

Allstate Insurance Group
# ALLSTATE NEW JERSEY INSURANCE GROUP
Northbrook, IL
721 U. S. Highway 202/206, Suite 300, Bridgewater, NJ 08807-1759
Web: www.allstate.com

Tel: 847-402-5000     Fax: 847-402-9116
AMB#: 18630

## BEST'S RATING

Based on our opinion of the group's Financial Strength, it is assigned a Best's Rating of A- (Excellent). The group's Financial Size Category is Class XI. Refer to the Preface for a complete explanation of Best's Rating system and procedure.

### RATING UNIT MEMBERS

Allstate New Jersey Insurance Group     (AMB# 18630):

| AMB# | COMPANY | RATING | |
|---|---|---|---|
| 12106 | Allstate New Jersey Insurance | A- | g |
| 13080 | Allstate New Jersey P&C Ins Co | A- | g |
| 12612 | Encompass Insurance Co of NJ | A- | g |
| 13082 | Encompass Prop&Cas Ins Co NJ | A- | g |

## RATING RATIONALE

**Rating Rationale:** The rating reflects the group's excellent capitalization, consistently strong operating performance and management's local market knowledge. Partially offsetting these positive factors are the group's geographic concentration within one state and significant dividend payments to its parent. The rating outlook is based on the group's solid capitalization and consistently favorable earnings expectations.

Allstate New Jersey's management has undertaken various actions to enhance the group's overall profitability since it became the dedicated New Jersey property and casualty carrier for Allstate. These actions included the implementation of a tiered private passenger auto rating plan, expansion of its distribution channels, a pronounced shift in its business mix and a proactive approach to cope with fraud detection and prevention. The impact of these initiatives is evident in the group's favorable operating results with double-digit returns on revenue and equity over the previous five-year period. Also positively impacting the group's operating performance is management's local market knowledge and ability to quickly react to changing market conditions. Further, New Jersey's 2003 private passenger auto insurance reforms that included measures to reduce fraud, lower the number of uninsured motorists and create a more competitive marketplace has favorably impacted the operating environment. The rating also acknowledges the efficiencies obtained as a member of Allstate Insurance Group, which is a market leader in the U.S. insurance industry.

The group's negative rating factors include its geographic concentration within one state that exposes its capitalization and earnings to regulatory mandates, weather-related losses and competitive pressures. This exposure was evident in recent years as the group's net premiums written declined due to increased competition in the New Jersey private passenger automobile market. The group's homeowners results also deteriorated in 2003 and 2004 due to increased weather losses, higher fire loss severity and increased environmental claims and severity. Further, the group has made significant dividend payments to its parent, NJ Holdings, LLC, over the previous five year period that has tempered surplus growth. Despite these negative factors, the group has continued to produce strong operating earnings and internally generate surplus growth. Additionally, the group implemented an expedited rate increase, conducted a field review of large fire losses and implemented a comprehensive underground oil tank strategy, which has improved homeowners' results in

*To view a company's complete BEST'S COMPANY REPORT,*
*refer to BEST'S INSURANCE REPORTS on CD-ROM,*
*or go online at www.ambest.com/bir*

**EXHIBIT 3**

11 of 13 DOCUMENTS

**DARRELL P. GRIFFIN AND DEBORAH M. GRIFFIN, Plaintiffs, vs. ALLSTATE INSURANCE COMPANY et al., Defendants.**

**CV 95-2537 RG (RMCx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*1995 U.S. Dist. LEXIS 11126*

**August 1, 1995, Decided**
**August 1, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The court issued an order to show cause whether removal of plaintiff insureds' state court action for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty against defendant insurer and defendant insurance agent was proper pursuant to *28 U.S.C.S. § 1441(a)*.

**OVERVIEW:** The insureds, residents of California, brought an action in state court against the insurer, a resident of Illinois, and the insurance agent who sold the insureds the policy, also a resident of California. The action alleged breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. The insurer removed the action to federal court. The court issued an order to show cause as to whether removal was proper under *28 U.S.C.S. § 1441(a)*. The court determined that removal was proper because the insureds did not allege that the insurance agent acted outside his scope of authority and that therefore there was no cause of action stated against the insurance agent under state law.

**OUTCOME:** The court determined that removal of the insureds' state court action was proper based on diversity jurisdiction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Removal > Basis > General Overview*

*Civil Procedure > Removal > Postremoval Remands > General Overview*
[HN1] Courts strictly construe the removal statute against removal jurisdiction. A court determines removability from the complaint as it existed at the time of removal, together with the removal notice. In order for a court to ignore the residency of a named defendant for the purposes of diversity jurisdiction, the defendant seeking removal must demonstrate that it is obvious according to settled law of the state that plaintiffs have failed to state a cause of action against the defendant.

*Business & Corporate Law > Agency Relationships > Disclosure > Identity of Principal*
*Business & Corporate Law > Agency Relationships > Types > Insurance Agent & Insurance Company*
*Insurance Law > Industry Regulation > Insurance Company Operations > Representatives > Agents > General Overview*
[HN2] It is well-established under California law that liability to an insured party for acts or contracts of an insurance agent within the scope of his agency, with a full disclosure of the principal, rests on the company. Where an agent is duly constituted and names his principal and contracts in his name and does not exceed his authority, the principal is responsible and not the agent. Where the agent contracts in the name of the insurer and does not exceed that authority, the insurer is liable, and not the agent.

**COUNSEL:** [*1] FOR DARRELL P GRIFFIN, DEBORAH M GRIFFIN, plaintiffs: A Clifton Hodges, Taylor & Hodges, Glendale, CA.

FOR ALLSTATE INSURANCE COMPANY, a corporation, JEFFREY S JACQUES, an individual, defen-

Case 3:08-cv-02612-SC    Document 1    Filed 05/23/2008    Page 65 of 78

Page 2
1995 U.S. Dist. LEXIS 11126, *

dants: Peter H Klee, Charles A Danaher, Luce Forward Hamilton & Scripps, San Diego, CA.

**JUDGES:** RICHARD A. GADBOIS, JR., United States District Judge

**OPINION BY:** RICHARD A. GADBOIS, JR.

**OPINION**

ORDER

This Court issued an order to show cause concerning the propriety of removal. Having considered the papers of the parties, this Court now rules as follows:

Removal to this Court was proper pursuant to *28 U.S.C. § 1441(a).*

**I. Background**

This case concerns an insurance dispute arising from the aftermath of the Northridge earthquake of January 17, 1994. Plaintiffs Darrell P. Griffin and Deborah M. Griffin (collectively, "the Griffins") are residents of the state of California. Defendant Allstate Insurance Company ("Allstate") is a citizen of Illinois. Defendant John Jacques, erroneously sued as Jeffrey S. Jacques ("Jacques"), is an authorized agent of Allstate and a citizen of California.

On or about November 7, 1983, the Griffins procured through Jacques an Allstate homeowner's policy, number 0 99 538598 11/07 ("the Policy"). Following the Northridge earthquake, Allstate denied coverage for damage to the Griffins' residence, assertedly because the Griffins' coverage had lapsed during the period from January 2, 1994, to January 22, 1994.

On or about January 27, 1995, the Griffins [*2] filed suit in the Superior Court for the County of Los Angeles, alleging three causes of action: (1) breach of contract against Allstate; (2) breach of the implied covenant of good faith and fair dealing against Allstate and Jacques; and (3) breach of fiduciary duty against Allstate and Jacques. Allstate removed to federal court on or about April 18, 1995.

**II. Analysis**

*A. The Standard for Removal*

[HN1] Courts strictly construe the removal statute against removal jurisdiction. *Boggs v. Lewis, 863 F.2d 662, 663 (9th Cir. 1988)*; *Takeda v. Northwestern Nat'l Life Ins. Co., 765 F.2d 815, 818 (9th Cir. 1985)*. A court will determine removability from the complaint as it existed at the time of removal, together with the removal notice. Schwarzer, Tashima, and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial, 2: 1096*; *Miller v. Grgurich, 763 F.2d 372, 373 (9th Cir. 1985).*

In order for a court to ignore the residency of a named defendant for the purposes of diversity jurisdiction, the defendant seeking removal must demonstrate that it "is obvious according to settled law of the state" that plaintiffs have failed to state a cause of action against [*3] the defendant. *McCabe v. General Foods Corp., 811 F.2d 1336, 1339 (9th Cir. 1987).*

*B. The Griffins Have Failed to State a Cognizable Legal Claim Against Jacques*

[HN2] It is well-established under California law that liability to an insured party for acts or contracts of an insurance agent within the scope of his agency, with a full disclosure of the principal, rests on the company. *Lippert v. Bailey, 241 Cal. App. 2d 376, 382, 50 Cal. Rptr. 478 (1966). See also Gasnik v. State Farm Ins. Co., 825 F. Supp. 245, 249 (E.D. Cal. 1992)* ("Where an agent is duly constituted and names his principal and contracts in his name and does not exceed his authority, the principal is responsible and not the agent"); *Kurtz, Richards v. Insurance Communicators, 12 Cal. App. 4th 1249, 1258, 16 Cal. Rptr. 2d 259 (1993)* ("Where the agent contracts in the name of the insurer and does not exceed that authority, the insurer is liable, and not the agent").

In this case, the Griffins specifically allege that Jacques was an agent of Allstate and that his agency was fully disclosed during the course of his dealings with the Griffins:

> The Griffins are informed and believe and thereon allege that [*4] Defendant, Jeffrey S. Jacques . . ., is, and at all relevant times was, an individual acting as agent for Allstate in the State of California.

Complaint P 3.

> The Griffins are informed and believe, and thereon allege, that at all times herein mentioned, Defendants, and each of them were the agents, servants, and employees of each of their Co-Defendants.

Complaint P 5.a.

Under the rule articulated in *Lippert, 241 Cal. App. 2d at 382*, and *Gasnik, 825 F. Supp. at 249*, it is apparent that no claim for bad faith or breach of fiduciary duty

will lie against Jacques. [1] Accordingly, it "is obvious according to settled law of the state" that the Griffins have failed to state a cause of action against Jacques, *McCabe, 811 F.2d at 1339*, and this Court may thus properly disregard the citizenship of Jacques in determining the existence of diversity jurisdiction.

> [1] The Griffins also allege that Jacques was their agent. *See* Complaint § 33. This Court finds this bare allegation of agency insufficient to support a claim against Jacques. *See Bennett v. Allstate Ins. Co., 753 F. Supp. 299, 303 (N.D.Cal. 1990)* ("If Miller were held to be the Benetts' fiduciary, he would have to place their interests not only before his own, but before his employer as well. But such a scenario plainly runs afoul of the long-

standing axiom that 'an agent may not compete with the principal, nor may he or she act as an agent for another whose interests conflict with those of the principal.'") (citations omitted).

[*5]  For the foregoing reasons, this Court finds that removal is proper pursuant to *28 U.S.C. §§ 1441(a) and 1332.*

**IT IS SO ORDERED.**

RICHARD A. GADBOIS, JR.

United States District Judge

DATED: August 1, 1995

4 of 13 DOCUMENTS

**CHARLES FARRUGIA, Plaintiff, v. ALLSTATE INSURANCE COMPANY, and
DOES 1-50, inclusive, Defendants.**

**No. C 07-00212 WHA**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

*2007 U.S. Dist. LEXIS 22628*

**March 8, 2007, Decided
March 8, 2007, Filed**

**COUNSEL:** [*1] For Charles Farrugia, Plaintiff: John N. Frye, LEAD ATTORNEY, Law Offices of John N. Frye, San Mateo, CA.

For Allstate Insurance Company, Defendant: Cynthia L. Mellema, LEAD ATTORNEY, Sonnenschein Nath & Rosenthal, San Francisco, CA; Kimberly Erin De Hope, LEAD ATTORNEY, Sonnenschein Nath & Rosenthal LLP, San Francisco, CA.

**JUDGES:** WILLIAM ALSUP, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** WILLIAM ALSUP

**OPINION**

**ORDER DENYING MOTION TO AMEND COMPLAINT, DENYING MOTION TO REMAND TO STATE COURT, AND CONTINUING CASE MANAGEMENT CONFERENCE**

**INTRODUCTION**

In this insurance-contract action, plaintiff Charles Farrugia seeks to amend his complaint and remand the case to state court. For the below-stated reasons, plaintiff's motion for leave to amend and remand to state court is **DENIED**.

**STATEMENT**

In this action, plaintiff contends that in 2001 and 2006 he was injured in two accidents involving uninsured drivers. Plaintiff alleges that after each accident he submitted claims to defendant Allstate Insurance Co. On the first claim, plaintiff contends that Allstate falsely told plaintiff that uninsured benefits were not available to him because he did not obtain the vehicle license number [*2] of the uninsured driver. On the second claim, plaintiff contends that Allstate wrongfully told him that his policy did not include uninsured motorist coverage. The complaint included claims based on breach of contract, breach of the implied covenant of good faith and fair dealing, and misrepresentation (Compl. PP 5-8).

This action was originally filed in San Francisco Superior Court on November 27, 2006. Defendant Allstate removed the case to federal court on January 11, 2007. In the notice of removal, defendant's sole asserted basis for jurisdiction was the parties' diversity of citizenship. Plaintiff is a resident of California and defendant is incorporated in and has its principal place of business in Illinois.

Plaintiff now seeks leave to amend his complaint to name as a defendant Steve Mahoney, an Allstate agent. The proposed amended complaint alleges that an individual from Mahoney's office was the person who made the misrepresentations to plaintiff. The proposed pleading also alleges that Mahoney does business in the City and County of San Francisco. Based on the proposed addition of Mahoney, plaintiff also seeks to remand the action to state court.

**ANALYSIS**

With respect [*3] to non-indispensable parties, the Ninth Circuit has stated: "Once removal has occurred, the district court has two options in dealing with an attempt to join a non-diverse party. *28 U.S.C. § 1447(e)* provides that '[i]f after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.'" *Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1068 (9th Cir. 2001)* (quoting *Newcombe v. Adolf Coors Co.,*

*157 F.3d 686, 691 (9th Cir. 1998)).* "The language of § 1447(e) is couched in permissive terms and it clearly gives the district court the discretion to deny joinder." *Newcombe, 157 F.3d at 691.* Factors that a district court may consider in the exercise of its discretion include: the statute of limitations, the timeliness of the motion to amend, whether the plaintiff seeks to join a party solely to destroy diversity, the apparent validity of the claim, and the prejudice to the plaintiff. *See* William W Schwarzer et al., California Practice Guide: Federal Civil Procedure Before [*4]   Trial 2:1078 (2005) (citing cases). *

> \* Generally, if the plaintiff seeks to add a necessary, nondiverse defendant, remand is appropriate. *See Yniques v. Cabral, 985 F.2d 1031, 1035 (9th Cir. 1993).* Here, plaintiff does not contend that Mahoney is a necessary defendant.

According to defendant, there are three reasons that counsel against granting plaintiff leave to amend and remanding to state court. *First,* defendant contends that plaintiff cannot state a valid claim for relief against Mahoney. *Second,* defendant alleges that without joining Mahoney, plaintiff will be able to obtain complete relief from defendant. *Third,* defendant contends that plaintiff seeks to join Mahoney only for the purpose of destroying diversity jurisdiction.

With the exception of defendant's first reason -- that plaintiff cannot state a claim for relief against Mahoney -- the factors tilt toward denying the addition of Mahoney. Plaintiff's reply brief does not respond to the contention that plaintiff seeks [*5] to add Mahoney only to destroy diversity jurisdiction. It has been noted that such fraudulent joinder may be a "dispositive factor" that the Court may consider "in deciding whether a plaintiff may join a nondiverse defendant." *Mayes v. Rapoport, 198 F.3d 457, 463 (4th Cir. 1999); Desert Empire Bank v. Ins. Co. of No. Am., 623 F.2d 1371, 1376-77 (9th Cir. 1980)* ("[W]e conclude that a trial court should look with particular care at such motive in removal cases, when the presence of a new defendant will defeat the court's diversity jurisdiction and will require a remand to the state court. In such cases, a plaintiff may well be inclined to add a new defendant only to have his action remanded to the state forum, the one that he had originally chosen as best suited to his purposes.") (citation omitted). Nor does plaintiff contend that joinder of Mahoney is necessary to obtain a full recovery. Plaintiff's request for money damages "could be fully satisfied by [defendant Allstate]." *Newcombe, 157 F.3d at 691.* Indeed, the proposed amended complaint does not include Mahoney in the prayer for relief. Moreover, plaintiff does not explain [*6] why he waited until January 2007 -- two months after the action was initially filed in state court -- to add

Mahoney has a defendant. For these reasons, plaintiff's motion for leave to amend must be denied.

Notwithstanding this ruling, it is worth discussing whether plaintiff could maintain a claim against Mahoney. Both parties spend a significant portion of their briefs discussing this issue. This order holds that plaintiff could state a claim against Mahoney under California law. Nothing in this order prevents plaintiff from pursuing such a claim against Mahoney in state court.

Defendant contends that plaintiff cannot state claims against Mahoney for misrepresentation, breach of contract, or bad faith. As defendants point out, California courts have recognized the general principle that an agent or employee of an insurance company is not liable to an insured while acting in the scope of the agency or employment. *See Lippert v. Bailey, 241 Cal. App. 2d 376, 382, 50 Cal. Rptr. 478 (1966).* Defendants contend that this principle alone demonstrates the futility of adding Mahoney, an individual Allstate agent, as a defendant.

The principle recognized in *Lippert* in 1966 was only a [*7] general one. Since *Lippert,* California courts have recognized three exceptions to the general rule. An agent may assume a greater duty -- and incur personal liability -- towards the insured by: (1) entering into "an express agreement to ensure adequate coverage"; (2) "a holding out by the agent to assume a greater duty toward an insured"; and (3) "misrepresenting the policy's terms or extent of coverage." *Paper Savers, Inc. v. Nacsa, 51 Cal. App. 4th 1090, 1097, 59 Cal. Rptr. 2d 547 (1996); see also Clement v. Smith, 16 Cal. App. 4th 39, 45, 19 Cal. Rptr. 2d 676 (1993)* ("Absent some notice or warning, an insured should be able to rely on an agent's representations of coverage without independently verifying the accuracy of those representations by examining the relevant policy provisions."). This has been referred to as a "special duty" exception to the general rule. As plaintiff points out, numerous judges within this district, including the undersigned, have recognized that California does not have a *per se* bar against finding individual insurance agents liable. *See, e.g., Kaighn v. Nat'l Life of Vt., No. C 02-24984 CRB, 2003 U.S. Dist. LEXIS 959, at *3-*4 (N.D. Cal. [*8] 2003)* (remanding action to state court and holding that "the *Lippert* rule does not preclude suit against an insurance agent who misrepresents the nature or scope of coverage or holds himself out as having special expertise in the type of insurance sought by the insured"); *Sun v. Equitable Life Assurance Soc'y, No. C 01-01553 WHA, 2001 U.S. Dist. LEXIS 9481, 2001 WL 764486, at *2-*3 (N.D. Cal. 2001)* (recognizing that "an agent may assume a greater duty and be held personally liable for merely negligently misrepresenting the scope of coverage under a policy"). The above-cited caselaw also disproves defendants' contention that the

*only* exception to the *Lippert* rule is where an agent acts as a "dual agent" on behalf of both the insurer and the insured. *See Quiroz v. Valley Forge Ins. Co., No. C 05-2025 SBA, 2005 U.S. Dist. LEXIS 43316, 2005 WL 1806366, at \*5 (N.D.Cal. July 28, 2005)* (citing *Macey v. Allstate Property and Casualty Ins. Co., 220 F. Supp. 2d 1116, 1120 (N.D. Cal. 2002))* ("California courts have recognized two separate 'lines of exception' to the general *Lippert* rule: (1) the dual agency exception, and (2) the 'special duty' exception.").

In the proposed amended complaint here, plaintiff [\*9] alleges that Mahoney's office "falsely told Plaintiff that uninsured motorist benefits were not available to him" and "wrongfully told Plaintiff that his policy did not include uninsured motorist coverage." Plaintiff contends that he relied on the misrepresentations and was induced not to pursue his uninsured motorist benefits (Prop. Am. Compl. PP 7, 20-21). This is sufficient to demonstrate that Mahoney "misrepresented the terms of the policy to the insured." *Paper Savers, Inc., 51 Cal. App. 4th at 1098*. Plaintiff thus appears to have a plausible theory of liability against Mahoney for misrepresentation of the policy's terms. The proposed amendment is therefore not futile. *See Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988)* ("[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.") (internal citations omitted).

The decisions on which defendant relies are unpersuasive. Those decisions are federal court decisions that relied on *Lippert* -- but without discussion of any of the subsequent authority that held individual [\*10] agents liable to insured plaintiffs. *See Sun, 2001 U.S. Dist. LEXIS 9481, 2001 WL 764486, at \*4* (distinguishing decisions that had "correctly quote[d] *Lippert*" but noting that in those cases "the plaintiff's complaint clearly alleged that the defendant insurance agent was an employee of the insurance company and acted within the scope of his employment"). For example, in *Duffy v. Allstate Insurance Co., Case No. SA CV 97-231-GLT(ANX), 1997 U.S. Dist. LEXIS 18023, at \*1 (C.D. Cal. Feb. 17, 2007)*, the district court relied on *Lippert* and denied a motion for leave to amend where the plaintiffs admitted that the "'entire controversy' [arose] from acts within the scope of [the individual agent's] agency." In *Mercado v. Allstate Ins. Co., 340 F.3d 824, 826 (9th*

*Cir. 2003)*, the Ninth Circuit only briefly discussed the general rule and the "dual agent" exception but not the "special duty" exception. Other decisions cited by defendants can also be distinguished for their failure to discuss the "special duty" exception to the general rule. *See Icasiano v. Allstate Ins. CO., 103 F.Supp. 2d 1187, 1190 (N.D. Cal. 2002); Moreno v. Allstate Ins. Co., No. CIV-S02-1426 DFL JFM, 2002 U.S. Dist. LEXIS 22073, 2002 WL 31133203, [\*11] at \*2 (C.D. Cal. Sept. 10, 2002)*. This order relies on the well-settled principle that a plaintiff can, for pleading purposes, maintain a claim against an individual insurance agent so long as the plaintiff alleges that the agent acted under one of the three exceptions recognized in *Paper Savers. See Smith v. New England Mut. Life Ins. Co., No. C 98-3083 SI, 1998 U.S. Dist. LEXIS 17572, 1998 WL 775124, at \*2 (N.D. Cal. Nov. 2, 1998)* ("Because *Lippert* is silent regarding liability for an agent's fraudulent actions and the instant case includes allegations of intentional misrepresentation, *Lippert* may not be authority for determining agent nonliability with respect to fraud claims.").

## CONCLUSION

This order holds that plaintiff could state a claim against Mahoney. It is conceivable -- if not likely -- that if Mahoney had been named as a defendant in the original state action, the Court would remand the instant action. But plaintiff's request to amend after a proper removal gives this Court the discretion to allow such amendment. Accordingly, for the above-stated reasons, plaintiff's motion for leave to amend is **DENIED**. Because diversity of citizenship exists between plaintiff and defendant, [\*12] the motion for remand is also **DENIED**.

At oral argument, plaintiff's counsel requested a one-week continuance of the case management conference. That request is **GRANTED**. The initial case management conference will be held on **APRIL 26, 2007**, at **11:00 A.M.** The joint case management statement is due by **APRIL 19, 2007**.

## IT IS SO ORDERED.

Dated: March 8, 2007.

WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE

# EXHIBIT C

05/22/2008  14:51  PAGE 3/4 * RCVD AT 5/22/2008 3:35:30 PM [Central Daylight Time] * SVR:CHIXRXF0/122 * DNIS:4777 * CSID:9167803760 * DURATION (mm-ss):01-08

1  CYNTHIA L. MELLEMA (State Bar No. 122798)
   JEFFRY BUTLER (State Bar No. 180936)
2  MEGAN L. DUNHAM (State Bar No, 245991)
   SONNENSCHEIN NATH & ROSENTHAL LLP
3  2121 N California Blvd., Suite 800
   Walnut Creek, CA 94596
4  Telephone: (925) 949-2600
   Facsimile: (925) 949-2610
5  Email:    cmellema@sonnenschein.com
             jbutler@sonnenschein.com
6            mdunham@sonnenschein.com

7  Attorneys for Defendant
   ALLSTATE INSURANCE COMPANY

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12  DORIS J. GILTON,                    No.

13           Plaintiff,                 DECLARATION OF RICHARD RENEY IN
                                        SUPPORT OF ALLSTATE'S NOTICE OF
14  vs.                                 REMOVAL

15  ALLSTATE INSURANCE COMPANY,
    and DOES 1 through 50, inclusive,
16
             Defendants.
17

18

19      I, RICHARD RENEY, declare:

20      1.    I am an _staff claim service adjuster_ for Allstate Insurance Company. I have been employed by

21  Allstate since _9/8/87_. I have personal knowledge of the facts set forth below and, if called as a

22  witness, could and would competently testify thereto.

23      2.    On or about February 1, 2008, Allstate received a letter from Jessica Bivens,

24  plaintiff's representative, demanding seven months of additional living expenses. Allstate had

25  paid approximately $18,450 per month for additional living expenses. Seven months of

26  additional living expenses would total approximately $129,150. A true and correct copy of Ms.

27  Bivens' February 1, 2008 letter is attached hereto as Exhibit 1.

28

05/22/2008  14:51  80-10:(ss-mm) NOITARUD * 09Γ£08Γ£916:DISC * ΓΓΓ4:SIND * SSΓΓΓ0ΓΕΧΓΗ:Γ·S * [emiΤ thgilyaD lartneC] MP 0Ε:SΕ:S TA DVCR * 4/4 EGAP

3.     On or about April 17, 2008, I received a letter from Ms. Bivens, demanding that Allstate pay $42,000 in architectural fees. Ms. Bivens also demanded that Allstate pay $7,346 in permit fees. A true and correct copy of Ms. Bivens' April 17, 2008 letter is attached hereto as Exhibit 2.

    I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct. Executed on May _22_, 2008, at _ROSEVILLE_, California.

                        RICHARD RENEY

SONNENSCHEIN NATH & ROSENTHAL LLP
2121 N. CALIFORNIA BLVD., SUITE 800
WALNUT CREEK, CALIFORNIA 94596
(925)949-2600

# EXHIBIT 1



# THE GREENSPAN CO./ ADJUSTERS INTERNATIONAL

PROFESSIONAL LOSS CONSULTANTS

400 Oyster Point Boulevard, Suite 519
South San Francisco, CA 94080-1921
(800) 248-3888
(650) 583-4300
Fax (650) 583-4049
www.greenspan.com
License No. 2E11301

February 1, 2008

**VIA FACSIMILE**: 916-780-3760
Linda Nunziati
Allstate Insurance Co.
P.O. 1109
Roseville, CA 95678

RE:    Insured:      Doris J. Gilton
       DOL:          04/17/07
       Location:     552-554-556-558 Central Avenue – San Francisco, CA 94117
       Insurer:      Allstate Insurance Company
       Policy No.:   067 198 242
       Claim No.:    0101901023
       Our File No.: SFO-20593-0407

Dear Ms. Nunziati:

I explained to the Gilton gentlemen that the $4400.00 per month rent as charged by Kelly Lewis was excessive for the home they were renting and that you could only justify $3650.00. Ms. Lewis was not agreeable to reducing her rental amount so the Gilton's have moved out. Enclosed is a copy of their new lease at a different location. As a result, the rent amount due as of February 1, 2008 is $4400.00.

As a side note, we understand the additional living expense coverage 12 month time limit is expired as of April 17, 2008. The fire occurred on April 17, 2007, however the initial settlement payment on the building was not received until November 16, 2007. The initial settlement took seven months before any funds were released. As such, Ms. Gilton has yet to receive any funds from the lienholder. She has been informed there were delays due to the holidays and has been assured the funds will be released by February 9, 2008. The repairs have not begun as there were no funds to do so. Ms. Gilton has contracted with a general contractor and plans are in process of being drawn in order to obtain permits. This process can take at least two months to receive permits to begin repairs. According to Allstate's contractor, Mel from Fixation, repairs are estimated to take at least nine months for repairs.

Another point to bring to your attention is that the initial building settlement was agreed to have been a starting point. Mel from Fixation is working on pricing and further justifications which will increase the settlement amount. It was understood by all that the initial payment was not sufficient to repair the fire damage to the building.



## THE GREENSPAN CO./ ADJUSTERS INTERNATIONAL

PROFESSIONAL LOSS CONSULTANTS

400 Oyster Point Boulevard, Suite 519
South San Francisco, CA 94080-1921
(800) 248-3888
(650) 583-4300
Fax (650) 583-4049
www.greenspan.com
License No. 2E11301

Therefore, we respectfully request an extension of time for the additional living expense coverage through November 17, 2008. This allows your insured the estimated nine months of repair time with an additional three months to obtain permits from the date the actual cash value payment was made.

We await your response.

Very truly yours,

**THE GREENSPAN CO./ADJUSTERS INTERNATIONAL**

Jessica Bivens
Executive General Adjuster
(800) 248-3888
(408) 205-6433 (Cell)

JB:ls
enclosure
cc:     Doris J. Gilton

# EXHIBIT 2

APR. 17. 2008   4:31PM     GREENSPAN CO 650 583 4049                NO. 592    P  1

## THE GREENSPAN CO./ ADJUSTERS INTERNATIONAL



PROFESSIONAL LOSS CONSULTANTS

400 Oyster Point Boulevard, Suite 519
South San Francisco, CA 94080-1921
(800) 248-3888
(650) 583-4000
Fax (650) 583-4049
www.greenspan.com
License No. 2511301

April 17, 2008

**VIA FACSIMILE**: 209-365-0685
Mr. Richard Reney
Allstate Insurance Co.
P.O. Box 1350
Woodbridge, CA  95258

RE:   Insured:       Doris J. Gilton
      DOL:           04/17/07
      Location:      552-554-556-558 Central Avenue – San Francisco, CA  94117
      Insurer:       Allstate Insurance Company
      Policy No.:    067 198 242
      Claim No.:     0101901023
      Our File No.:  SFO-20593-0407

Dear Mr. Reney:

Enclosed please find the invoices from Doris Gilton for architectural services according to her contract with Kotas/Pantaleoni Architects.

The contract is a "not to exceed" contract for $42,000.00. I have enclosed each month's invoice as well as an invoice summary to show what has been incurred against the $42,000.00 limit. We request Allstate pay the full $42,000.00 with the understanding this is the contract amount and will be incurred.

In the invoice summary, it is indicated that two charges of $3852.00 and $3494.00 have been incurred for permits. These charges are above and beyond the architectural services.

I have also enclosed copies of checks noting what payments have already been made for architectural services by Ms. Gilton.

Lastly, what is the status of the additional loss of rents claim made in my correspondence of February 1, 2008? Linda Nunziati had agreed to a rental value of $3650.00 for the home the Gilton brothers were renting in which they were being charged $4400.00. Once the brothers were informed their full rent would not be covered, they moved to a 3 bedroom home in San Francisco for $4400.00. There is a difference due of $750.00 for February, March and the first 17 days of April. Therefore, the balance due for the ALE is $1925.00.



# THE GREENSPAN CO./ ADJUSTERS INTERNATIONAL

PROFESSIONAL LOSS CONSULTANTS

400 Oyster Point Boulevard, Suite 519
South San Francisco, CA 94080-1921
(800) 248-3888
(650) 583-4300
Fax (650) 583-4049
www.greenspan.com
License No. 2511301

Please issue payment in the amount of $51,271.00 for the architectural services, permit invoices and monies due for the additional living expenses.

Very truly yours,

**THE GREENSPAN CO./ADJUSTERS INTERNATIONAL**

Jessica Bivens

JB:ls
enclosures
cc:    Doris J. Gilton